# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

**FILED**

v.

J.N

NOV ⅄ 7 2006

NOV. 7, 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

ERICK ALVAREZ,
     aka "DIABLO," aka "_____";
CHARLES SPAULDING,
     aka "WEDO," aka "WHITE BOY," aka "TONY";
MICHAEL DALTON,
     aka "LITTLE," aka "FOLKS," aka "LITTLE FOLKS";
JASON SPAULDING,
     aka "JOKER";
DAVID LAMAS; and
CELESTE MELENDEZ

**CASE NUMBER:**

# 06CR0812

**MAGISTRATE JUDGE MASON**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  Starting no later than __September 2004__, and continuing until __at least September 27, 2005__, in __Cook__ County, in the __Northern__ District of __Illinois__, defendants did,

     conspire with each other to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, in excess of 500 grams of mixtures containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title __21__ United States Code, Section __846 and Title 18, United States Code, Section 2__.

     I further state that I am a __Special Agent with the Federal Bureau of Investigation__ and that this complaint is based on the following facts:

     See attached affidavit.

**DOCKETED**

**NOV 13 2006**

Continued on the attached sheet and made a part hereof:  __X__  Yes  ____  No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__November 7, 2006__     at     __Chicago, Illinois__
Date                                 City and State

__MICHAEL T. MASON, U.S. Magistrate Judge__     _____
Name & Title of Judicial Officer                     Signature of Judicial Officer

STATE OF ILLINOIS )
                              )     SS
COUNTY OF COOK )

## AFFIDAVIT

I, Michael Moreland, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn under oath, states as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I am currently assigned to the FBI's Joint Task Force on Gangs II, Chicago Field Division, and have been so assigned for the past two years. As part of my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846. I have received special training in the enforcement of laws concerning controlled substances and gang activity. I am familiar with and have participated in all of the normal methods of investigation including, but not limited to, search warrants, visual surveillance, electronic surveillance, the debriefing of defendants, witnesses, informants, and others who have knowledge of the distribution of controlled substances, as well as the use of informants. Based on my training and experience, I am familiar with the ways in which drug traffickers and gang members conduct their drug-related business, including, but not limited to, their methods of distributing narcotics, their use of telephones, and their use of code words to identify themselves, and the nature of the communications.

2.    The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers and the Drug Enforcement Administration High Intensity Drug Trafficking

Area ("HIDTA"); (c) information provided by a cooperating witness (identified below as CW1) who has proven reliable and provided information which has been independently corroborated, as set forth in part, herein; (d) analysis of pen register and trap and trace data; (e) review of consensually-recorded conversations and conversations recorded pursuant to court authorization; and (f) my training and experience and the training and experience of other law enforcement agents. The information in this Affidavit is also based on, among other reports: laboratory analysis reports; intelligence reports of telephone record, pen register, and trap and trace analyses; audiotapes of consensually-recorded conversations; and criminal history records maintained by the Chicago Police Department ("CPD"), Illinois State Police ("ISP"), and the National Crime Information Center ("NCIC").

3. This Affidavit is made for the purpose of establishing probable cause in support of a Criminal Complaint charging:

      a. ERICK ALVAREZ, also known as ("aka") "DIABLO," aka "D";
      b. CHARLES SPAULDING, aka "WEDO," aka "WHITE BOY," aka "TONY";
      c. MICHAEL DALTON, aka "LITTLE," aka "FOLKS," aka "LITTLE FOLKS";
      d. JASON SPAULDING, aka "JOKER:;
      e. DAVID LAMAS; and
      f. CELESTE MELENDEZ

with conspiring with each other and with others known and unknown to the United States to knowingly and intentionally possess with intent to distribute and to distribute a controlled substances, namely, in excess of 500 grams of mixtures containing cocaine, in violation of Title 21, United States Code, section 841(a)(1), in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

## II.  OVERVIEW OF CONSPIRACY

4.       Since approximately September 2004, the Chicago Police Department ("CPD"), the FBI, and the Drug Enforcement Administration High Intensity Drug Trafficking Area ("HIDTA") have been investigating the SATAN DISCIPLE ("SD") street gang and its drug trafficking operations in the Chicago, Illinois area.

5.       The SD street gang was founded in Chicago, Illinois in the early 1960's.[1]  There are in excess of forty identified sections of the SD street gang in the Chicago area, as well as in Indiana, Wisconsin, Florida, Texas, and Oklahoma. The gang uses violence and intimidation against its rivals to ensure its continued drug distribution. The SD street gang is organized on hierarchal basis. At the time of the conspiracy, the SD street gang was governed by five "Board Members." Each board member oversaw a certain region of SD sections. Each section of the SD street gang is governed by a "Chief." In addition to the "Chief," each section has a "Second Seat" who acts as an advisor and second-in-command, a "Secretary" who keeps track of the meetings, and a "Treasurer" who keeps track of dues. Each section also has an "Enforcer," who metes out "violations," or punishment, to members that disobey orders or rules. Under these officers are the "soliders," whose numbers vary from section to section, and can be as many as forty to fifty.

6.       During the course of the instant investigation, CPD, FBI, and HIDTA identified certain members of the leadership of the 42nd and Campbell section ("42nd Section") of the SD street

---

[1] The explanations and identifications of the SD street gang and SD street gang members' rank is based on: my knowledge of and prior experience in Chicago area street gang investigations and violent crime, including those at federal, state and local levels; published sources of information concerning Chicago area street gangs; information obtained during past interviews with numerous gang members and criminal informants conducted by me and other law enforcement officers; and information I have obtained from other investigators experienced in street gang investigations.

gang, and certain individuals who supplied the 42nd Section of the SD street gang with cocaine. The following is a brief summary of the roles each of the members of the 42nd Section of the SD street gang and cocaine suppliers identified in this complaint and the paragraphs in this Affidavit pertaining to each:

  a. **ERICK ALVAREZ**: is the Chief of the 42nd Section of the SD street gang, and is a distributor of cocaine, who is supplied by CHARLES SPAULDING and DAVID LAMAS. ¶¶ 8, 16, 17-53, 72-88, 103-108, 126-130, 143-146, 150-161, 163-175.

  b. **CHARLES SPAULDING**: is a supplier of cocaine to the 42nd Section of the SD street gang. ¶¶ 8, 20-24, 28-33, 38-43, 45, 48, 49-52, 54-71, 73-87, 89-101, 109-119, 121-122, 124-125, 131-142, 147-149, 161, and 175.

  c. **DAVID LAMAS**: is a supplier of cocaine to the 42nd Section of the SD street gang. ¶ 8, 103-108, 126-130, 143-146, 150-154, 161, 165-175.

  d. **JASON SPAULDING**: assists CHARLES SPAULDING in selling cocaine to the 42nd Section of the SD street gang. ¶¶ 8, 38, 60-61, 94-97, 114-115, 118-120, 123, 158-159, and 175.

  e. **MICHAEL DALTON**: is a member of the 42nd Section of the SD street gang, and is a distributor of cocaine who is supplied by CHARLES SPAULDING. ¶¶ 8, 15-16, 60-61, 70-71, 89-97, 140-142, 147-149, and 175.

  f. **CELESTE MELENDEZ**: assists CHARLES SPAULDING in distributing cocaine to the 42nd Section of the SD street gang. ¶¶ 8, 31, 54-59, 62-69, 99-101, 112-113, 116, 131, 133, 137-139, and 175.

## III.   OVERVIEW OF INVESTIGATION

### A.   The Undercover Agent

7.     This investigation has utilized an undercover FBI agent (hereinafter "UCA"). Confidential Witness 1 (identified below) introduced UCA to members of the conspiracy, namely ALVAREZ. UCA held herself out as the cousin of Confidential Witness 1, who sought to obtain cocaine on behalf of her fictitious boyfriend, who the UCA claimed was a drug dealer.

8.     During the course of the investigation, UCA conducted consensually recorded conversations with ALVAREZ and conducted controlled and surveilled purchases of cocaine from ALVAREZ, who was supplied by CHARLES SPAULDING and LAMAS.

### B.   The Confidential Witness

9.   Confidential Witness 1 ("CW1")

a.     CW1 is an associate of members of the 42nd Section of the SD street gang. CW1 is not a member of the SD street gang. CW1 has been providing reliable, timely information to the FBI since approximately September 2004. During this time, FBI Agents have spoken to CW1 in person, or telephonically, on numerous occasions. A substantial portion of CW1's information regarding the 42nd Section of the SD street gang has been corroborated by independent investigation that includes physical surveillance, interviews of SD street gang members, telephone record analysis, UCA, CW1's participation in several consensually monitored telephone and non-telephonic conversations with several members of the 42nd Section of the SD street gang, and Title III interceptions.

b.     CW1 has agreed to cooperate with the government in exchange for payment. To date, CW1 has been paid approximately $9,332.90 for his/her cooperation.

5

### C. The Wiretap Investigation

10. Pursuant to an order signed by Chief Judge Charles P. Kocoras on July 22, 2005, the FBI began monitoring telephone conversations until August 20, 2005 on telephone number (773) 426-7477 ("Target Phone 1"), a phone subscribed to ERICK ALVAREZ, 5549 S. California Avenue, Chicago, Illinois, and used by ERICK ALVAREZ, and telephone number (773) 936-6671 ("Target Phone 2"), a phone subscribed to Jason Zamora, 2720 West 37th Place, Chicago, Illinois, and used by CHARLES SPAULDING.

11. On August 29, 2005, Chief Judge Charles P. Kocoras signed an order allowing the FBI to continue monitoring Target Phone 1 and Target Phone 2 until September 27, 2005.

12. In many of the intercepted and consensually recorded calls, coded language was used to conceal the true nature of the telephone calls. At various points in this Affidavit, I have placed in brackets or parentheses my understanding of what was being said during those calls. My understanding is based on the contents and context of the conversations, my experience as a law enforcement officer, statements made to me or other law enforcement officers by CW1, and the experience of other law enforcement agents and officers in this investigation, and the evidence gathered to date in the investigation. The times listed for these calls are approximate. Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of intercepted conversations. They do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

### D.    Surveillance

13.    During the course of the investigation, law enforcement officers have surveilled the conduct of co-conspirators in and around the Chicago, Illinois area. The surveillance has included observations of hand-to-hand drug transactions in the Chicago area.

### E.    Seizures

14.    The investigation has resulted in numerous narcotics seizures, some of which are detailed in Section IV, that total more than 500 grams of cocaine.

## IV.    PROBABLE CAUSE FOR REQUESTED COMPLAINT

### A.    September 16, 2004 Statements MICHAEL DALTON[2] to Law Enforcement Regarding the SD Street Gang.

15.    On September 16, 2004, CPD officers arrested MICHAEL DALTON for possession of a firearm. DALTON waived his Miranda rights and agreed to speak to the arresting officers and a FBI agent concerning his possession of the firearm as well as his membership with the SD street gang. The information is believed to be reliable in that DALTON's information is partially corroborated by CW1.[3] Moreover, the information provided by DALTON was against DALTON's penal interest.

---

[2]The identification of MICHAEL DALTON in this Affidavit is based upon the following: First, CW1 has identified DALTON. Second, law enforcement has been able to identify DALTON's voice because that voice has been intercepted numerous times, particularly on Target Phone 2, because DALTON was identified or identified himself in many of those calls with the same alias names, "LITTLE," "FOLKS," and "LITTLE FOLKS." Third,, law enforcement has had conversations with MICHAEL DALTON during which MICHAEL DALTON identified himself.

[3]On or about September 14, 2005, CW1 provided information pertaining to the distribution of drugs by the 42nd Section of the SD street gang. CW1 said that MICHAEL DALTON, who CW1 also knows as "LITTLE FOLKS," received his cocaine from CHARLES SPAULDING. According to CW1, DALTON resold the cocaine on the weekend in the 42nd Section.

7

16.     DALTON informed law enforcement that he is a member of the 42nd Section of the SD's street gang. DALTON identified ERICK ALVAREZ[4] as the Chief of the 42nd Section. According to DALTON, he held the position of Chief of Security or Enforcer for the 42nd Section until approximately a year before his arrest. DALTON stated that each member of the 42nd Section is required to contribute $20 in dues on a monthly basis. Each member further required to attend weekly meetings of the gang. The money collected during the meetings is used to buy "straps" (guns) and other necessities for the gang. DALTON stated that ALVAREZ sells cocaine and marijuana. DALTON stated that ALVAREZ does not sell crack cocaine because it attracts too much attention from law enforcement.

---

[4] The identification of ERICK ALVAREZ in this Affidavit is based upon the following: First, CW1 has identified ALVAREZ. Second, law enforcement has been able to identify ALVAREZ's voice because that voice has been intercepted numerous times, particularly on Target Phone 1, because ALVAREZ was identified or identified himself in many of those calls with the same alias names, "DIABLO" and "D"; and because the voice was consistently associated with the same phone numbers, particularly Target Phone 1. Third, during particular intercepted calls, ALVAREZ arranged to personally meet with other co-conspirators or the UCA and those meetings were surveilled by law enforcement, or attended by the UCA. Fourth, law enforcement has had conversations with ERICK ALVAREZ during which ERICK ALVAREZ identified himself.

**B.** **October 15, 2004 Controlled Buy of Approximately 54.3 Grams of Cocaine from ERICK ALVAREZ and CHARLES SPAULDING.[5]**

17.     On or about October 13, 2004, CW1 placed a consensually recorded telephone call to ALVAREZ on Target Phone 1. During the recorded telephone conversation, CW1 told ALVAREZ that CW1's sister had called him/her. ALVAREZ asked CW1 what his/her sister needed. CW1 told ALVAREZ that his/her sister needed the "lady with the white eyes" (cocaine). ALVAREZ asked CW1 how much CW1's sister needed. CW1 responded, "two ounces of it [cocaine]." ALVAREZ again asked how much was needed. CW1 responded, "two ounces [of cocaine]." ALVAREZ further told CW1, "I can get it [cocaine] right now." CW1 asked ALVAREZ about the price. ALVAREZ stated that the price was $1300.

18.     On or about October 15, 2004, at approximately 4:18 p.m., law enforcement met with CW1, and searched him/her for illegal drugs or contraband with negative results. Law enforcement then provided CW1 with $1300 in cash to pay for the cocaine CW1 ordered from ALVAREZ. Additionally, law enforcement equipped CW1 with a body recording device. Law enforcement subsequently drove CW1 to a currency exchange at 4000 S. Archer in Chicago, Illinois where he/she was dropped off. Law enforcement maintained surveillance of CW1 through the controlled transaction.

---

[5]The identification of CHARLES SPAULDING in this Affidavit is based upon the following: First, CW1 has identified CHARLES SPAULDING. Second, law enforcement has been able to identify CHARLES SPAULDING's voice because that voice has been intercepted numerous times, particularly on Target Phone 2; because CHARLES SPAULDING was identified or identified himself in many of those calls with the same alias names, "WEDO," "WHITE BOY," and "TONY"; and because the voice was consistently associated with the same phone numbers, particularly Target Phone 2. Third, during particular intercepted calls, CHARLES SPAULDING arranged to personally meet with other co-conspirators and those meetings were surveilled by law enforcement. Fourth, law enforcement has had conversations with CHARLES SPAULDING during which CHARLES SPAULDING identified himself.

19.     While at the currency exchange, CW1 placed several calls to ALVAREZ. CW1 wore a body recording device that captured CW1's side of the telephone conversations with ALVAREZ. At approximately 4:34 p.m., CW1 called ALVAREZ on Target Phone 1, and told him that the money for the cocaine transaction had arrived. ALVAREZ told CW1 that he would pick CW1 up in front of the currency exchange. At approximately 4:46 p.m., ALVAREZ, using Target Phone 1, called CW1, and instructed CW1 to meet him in the alley across from the currency exchange. At approximately 4:49 p.m., law enforcement observed CW1 leave the area of the currency exchange, walk to the alley across from the currency exchange, and enter a Chrysler Concorde, bearing IL license plate 7450433 (hereinafter "the Concorde") that was driven by ALVAREZ.

20.     Once inside of the Concorde, CW1 observed ALVAREZ place several calls using a cellular telephone, which I know to be Target Phone 1. The body wire recording worn by CW1 recorded ALVAREZ's side of those conversations. In one of those phone calls, ALVAREZ said, "Bring me two of those. . .What did I go all the way over there for last time?. . .Yeah. . .How much?. . .. I'm saying, how much?. . . Same price as before? . . . Yeah . . . No . . . Do you know who this is? . . . Meet you by where? . . . 31st and Kedzie . . . How long though? . . . How long? . . . Well, call me right back, bro, 'cause I'm shopping . . .Come where? . . . I ain't even got a car to go all the way over there . . . Alright . . . Call me back." In this conversation, I believe that ALVAREZ was speaking to CHARLES SPAULDING about supplying cocaine to ALVAREZ that he would, in turn, sell to CW1.

21.     At approximately 5:19 p.m., ALVAREZ received an incoming call on Target Phone 1 from CHARLES SPAULDING. The body recording device worn by CW1 recorded both ALVAREZ's side of the conversation and portions of CHARLES SPAULDING's side of the

conversation. During the conversation, CHARLES SPAULDING told ALVAREZ that he was on Roosevelt and Cicero and was almost to the location where ALVAREZ and CW1 were waiting in the Concorde. Upon the conclusion of the call, ALVAREZ asked CW1, "So after we get it [the cocaine], where we going?" CW1 asked ALVAREZ to drop CW1 off at CW1's home. ALVAREZ then stated that he was going to speed up the cocaine transaction. At approximately 5:21 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING, who ALVAREZ instructed that he would meet by the junkyard at 31st and Kedzie in Chicago. After the phone call, ALVAREZ told CW1, "the only thing is driving back with it [the cocaine]." ALVAREZ added that he would rather drive back with the cocaine in his car. ALVAREZ further stated that he "could always put it [the cocaine] under the hood [of the car to avoid detection by law enforcement]."

22.     At approximately 5:32 p.m., law enforcement observed ALVAREZ and CW1 arrive at the junkyard located at 31st and Kedzie in Chicago. Upon their arrival, ALVAREZ complained that it was too muddy. ALVAREZ, using Target Phone 1, called CHARLES SPAULDING and told him that the junkyard was flooded. Law enforcement observed ALVAREZ drive the Concorde, in which CW1 was still a passenger, to the parking lot of a restaurant, Harper's Grill, located at 31st and Kedzie. ALVAREZ told CW1 that CHARLES SPAULDING was three minutes away. While waiting for CHARLES SPAULDING, CW1 counted out the $1300 in buy money for ALVAREZ, and gave the money to ALVAREZ. At approximately 5:41 p.m., law enforcement observed a burgundy Chevrolet Tahoe, license plate number 5574912 (hereinafter "the Tahoe"), drive into the parking lot. Illinois Secretary of State records indicated that on October 15, 2004, the Tahoe was registered to CHARLES SPAULDING, 1439 South 59th Avenue, Cicero, IL 60804. CW1 observed that CHARLES SPAULDING was the driver of the Tahoe.

11

23. Shortly after the arrival of CHARLES SPAULDING, law enforcement observed ALVAREZ exit the Concorde and enter the Tahoe. CW1 remained in the Concorde. Shortly thereafter, law enforcement observed ALVAREZ exit the Tahoe, open the hood of the Concorde, and place an unknown object under the car battery. Law enforcement observed the Concorde and the Tahoe exit the parking lot and leave the area.

24. Shortly thereafter, CPD officers conducted an investigative stop of the Tahoe. The officers identified the driver of the Tahoe as CHARLES SPAULDING, residing at 1439 S. 59th Avenue, Cicero, Illinois. There were no passengers in the Tahoe. The officers searched CHARLES SPAULDING and the Tahoe, and found $1300 in SPAULDING's possession, the same amount CW1 gave ALVAREZ to purchase the two ounces of powder cocaine.

25. At approximately 5:50 p.m., law enforcement observed ALVAREZ and CW1 arrive in the Concorde at CW1's home. Both ALVAREZ and CW1 exited the Concorde. CW1 observed ALVAREZ raise the hood of the Concorde and remove two clear plastic baggies from beside the car battery. ALVAREZ gave the baggies to CW1, reentered the Concorde, and drove away from the area. At approximately 5:54 p.m., law enforcement met with CW1 at a prearranged meet location. At that meeting, CW1 provided law enforcement with two plastic baggies containing a white powdery substance believed to be cocaine. Law enforcement retrieved the body recording device from CW1, and searched CW1 for drugs or contraband, with negative results. The substance inside of the two plastic baggies was subsequently tested, and found to be approximately 54.8 net grams of cocaine hydrochloride.

12

**C.**     **June 8, 2005 Controlled Buy of Approximately 110.5 Grams of Cocaine from ERICK ALVAREZ and CHARLES SPAULDING.**

26.     On or about June 8, 2005, CW1 coordinated a controlled purchase of approximately four and a half ounces of cocaine by the UCA from ALVAREZ. At approximately 12:41 p.m, CW1 made a consensually recorded call to ALVAREZ on Target Phone 1. ALVAREZ did not answer the call; therefore, CW1 left a message stating that CW1 knew that ALVAREZ did not answer private calls, but that CW1 was with his/her cousin (the UCA) and they needed to talk to him.

27.     At approximately 12:44 p.m., CW1 placed a second consensually recorded call to Target Phone 1 and was able to reach ALVAREZ. CW1 asked ALVAREZ if he was all set. ALVAREZ asked, "She [the UCA] wants the same thing [four and a half ounces of cocaine] we talked about?" CW1 replied "yes." ALVAREZ told CW1 to call him back in three minutes "to make sure everything's all good."

28.     At approximately 12:45 p.m., pen register data for Target Phone 1 showed that an outgoing telephone call was made from Target Phone 1 to Target Phone 2. At approximately 12:47 p.m., pen register data showed that an outgoing telephone call was made from Target Phone 1 to Target Phone 2. At approximately 12:50 p.m., pen register data showed that Target Phone 1 received an incoming telephone call from Target Phone 2. Based on this data, I believe that following the call with CW1, ALVAREZ attempted to contact CHARLES SPAULDING, and CHARLES SPAULDING subsequently called ALVAREZ back, so that ALVAREZ could arrange to get the cocaine that he planned to sell to the UCA.

29.     At approximately 12:50 p.m., CW1 made a consensually recorded phone call to ALVAREZ on Target Phone 1. ALVAREZ told CW1, "Hey don't hang up, don't hang up, hold on." After a brief pause, CW1 told ALVAREZ that they [CHARLES SPAULDING and ALVAREZ]

13

were 10 minutes away. ALVAREZ told CW1, "Okay. Look it, you're gonna have to meet me by the house 'cause I don't know if you know this, that phone sounds all fuckin' crazy. Every time you talk, it sounds all staticy." CW1 said that he/she would put the antenna up. CW1 and ALVAREZ discussed the possibility of conducting the transaction at ALVAREZ's residence. I am aware that during the course of the investigation and to date, ALVAREZ has resided at 4048 S. Campbell Avenue in Chicago, Illinois (hereinafter "ALVAREZ's residence"). ALVAREZ further told CW1 that "He's coming though, he's on his way [with the cocaine to meet with ALVAREZ] already." ALVAREZ also told CW1 that it would take CHARLES SPAULDING "maybe twenty, thirty minutes" to arrive with the cocaine. CW1 told ALVAREZ that they (UCA and CW1) would call ALVAREZ when they got closer (to ALVAREZ's residence).

30.    At approximately 1:01 p.m., pen register data showed that Target Phone 1 received an incoming telephone call from Target Phone 2. I believe that CHARLES SPAULDING contacted ALVAREZ, and that during this call ALVAREZ notified CHARLES SPAULDING that CW1 and UCA were on their way to ALVAREZ's home and that the cocaine transaction was going to happen soon.

31.    At approximately 1:25 p.m., CW1 placed a consensually recorded call to Target Phone 1 and spoke to ALVAREZ. ALVAREZ stated, "Look it, this what I need you to do...this guy don't want to come to my house. He said we have to meet him somewhere else, because he doesn't want to come to the neighborhood in that, because he's gonna be in the Tahoe and his lady [CELESTE MELENDEZ][6] got the white car, the Bonneville, [bearing an Illinois license plate

<hr />

[6]The identification of CELESTE MELENDEZ in this Affidavit is based upon the following: First, law enforcement has been able to identify CELESTE MELENDEZ's voice because that voice has been intercepted numerous times, particularly on Target Phone 2; because CELESTE

registered in the name of CHARLES SPAULDING (hereinafter "the Bonneville")], . . . so, you

gonna have to pick me up and when I'm with you, I'm gonna call him, see where he's at. We'll have

to meet him up somewhere." CW1 asked where. ALVAREZ responded, "Should be somewhere,

like somewhere out of the neighborhood. He just doesn't want to come into the neighborhood, 'cause

he said, he said that uh...You know how WHITE BOY [CHARLES SPAULDING] is." ALVAREZ

told CW1 to call when they were out front (of ALVAREZ's residence) and he would come out and

go with them. CW1 asked ALVAREZ to call him (referring to ALVAREZ's cocaine source,

CHARLES SPAULDING) and see where they would be meeting so that CW1 could tell CW1's

cousin. ALVAREZ told CW1 to call him back in two minutes.

32.    At approximately 1:27 p.m., pen register data showed that Target Phone 1 placed an

outgoing telephone call to Target Phone 2. I believe that ALVAREZ contacted CHARLES

SPAULDING in order to determine a place to meet so that CHARLES SPAULDING could deliver

the cocaine to ALVAREZ.

33.    At approximately 1:35 p.m., CW1 made a consensually recorded call to ALVAREZ

on Target Phone 1. CW1 asked ALVAREZ if ALVAREZ had called "him" (referring to

ALVAREZ's cocaine source, CHARLES SPAULDING). ALVAREZ responded that he had, and

instructed CW1 to "come pick me up." CW1 asked where they were going, because his/her cousin

(the UCA) was paranoid. ALVAREZ responded, "Nah, don't worry. We're gonna meet him by my

brother's house, over there by uh, 67th [based on subsequent surveillance, the house is located at 4015

W. Marquette Road in Chicago, Illinois] . . . that way it will be all good, 'cause he's right there, and

_____

MELENDEZ was identified or identified herself in many of those calls by name. Second, during
particular intercepted calls, CELESTE MELENDEZ arranged to personally meet with other co-
conspirators and those meetings were surveilled by law enforcement.

he says he's got the baby with him, so, I don't know, we're just gonna go up there instead. You can just leave me right there, he said he'd drive me back."[7] CW1 asked, "Right there by the, by your brother's house, by the gas station?" After CW1 told ALVAREZ that they (CW1 and the UCA) were 10 minutes away, ALVAREZ told CW1 to call him when they were close to ALVAREZ's residence.

34.    At approximately 1:54 p.m, law enforcement searched the CW1 for illegal drugs or contraband and to account for any money already in the CW1's possession. No drugs, money or contraband were found. Law enforcement also outfitted CW1 and the UCA with a body recording device and transmitted. Law enforcement gave the UCA $2400 for the controlled purchase of four and a half ounces of cocaine from ALVAREZ and the CW1. The UCA then drove CW1 in the UCA's vehicle to the area of ALVAREZ's residence.

35.    At approximately 2:01 p.m., pen register data showed that Target Phone 1 received an incoming telephone call from Target Phone 2. At approximately 2:03 p.m., CW1 used the UCA's cellular telephone, which was placed on speaker phone so that both sides of the conversation were audible and recorded, to make a consensually recorded call ALVAREZ on Target Phone 1. CW1 told ALVAREZ that they were on Campbell (near ALVAREZ's residence). ALVAREZ said he would be right out.

36.    At approximately 2:05 p.m, the UCA pulled over in front of 4045 S. Campbell and watched as ALVAREZ entered to the UCA's vehicle. ALVAREZ instructed UCA to take a right on 40th Street and to then drive south on Western Avenue. As they were driving, UCA stated, "I

---

[7]CW1 has identified Individual A as ALVAREZ's brother. According to Illinois Secretary of State records, in June 2004, a driver's license was issued to Individual A with the address 4015 West Marquette Road, Chicago, Illinois 60629. On September 14, 2005, ALVAREZ told the UCA that the house on Marquette belonged to his mother.

thought we were going to do it [the deal] here [at ALVAREZ's residence]." ALVAREZ responded,

"Nah, this guy [CHARLES SPAULDING] is all paranoid about coming to the neighborhood . . .

gonna meet him by my brother's house."

37.     At approximately 2:09 p.m., the UCA told ALVAREZ that the UCA's (fictitious)

boyfriend was happy with the price (of the cocaine) and that he (the boyfriend) usually deals with

a white guy on the north side. ALVAREZ stated, "Oh, he charges him a lot more [for cocaine]?"

The UCA told ALVAREZ that she did not know how much her boyfriend was charged, but that she

hears him complaining a lot about it. ALVAREZ stated, "That would have to be a lot then." The

UCA explained that she helped run up some credit card debt and that was why she was having to

help out.

38.     At approximately 2:11 p.m., the UCA told ALVAREZ that she had told CW1 that

she wanted to do the deal (the cocaine transaction) at 1:00 p.m.  CW1 said that "WEDO"

(CHARLES SPAULDING) was an "airhead." ALVAREZ agreed. The UCA asked ALVAREZ if

he knew the guy (who was going to supply the cocaine) and ALVAREZ said that he did. ALVAREZ

explained, "He's cool. He's my brother-in-law's [JASON SPAULDING's][8] brother . . . He's on the

weird side . . . He thinks he's black. He does, he really does. I mean, this guy's like Irish . . . He got

really long hair with braids and...do rags...super gigantic clothes...He's cool though...He's got weird

_____

[8]The identification of JASON SPAULDING in this Affidavit is based upon the following:
First, CW1 has identified JASON SPAULDING.  CW1 has told law enforcement that JASON
SPAULDING is married to the sister of ALVAREZ's girlfriend, Individual B.  Second, law
enforcement has been able to identify JASON SPAULDING's voice because that voice has been
intercepted numerous times, particularly on Target Phone 2; because JASON SPAULDING was
identified or identified himself in many of those calls with the same alias name, "JOKER".  Third,
during particular intercepted calls, JASON SPAULDING arranged to personally meet with other co-
conspirators and those meetings were surveilled by law enforcement.  Fourth, law enforcement has
had conversations with JASON SPAULDING during which JASON SPAULDING identified
himself.

habits." The UCA asked ALVAREZ whether he trusted "WEDO" (CHARLES SPAULDING, the supplier of cocaine) and ALVAREZ replied that he did. ALVAREZ stated, "I've known him for years. Since I, like fifteen, I'm twenty, like ten years. I'm twenty-five now."

39.     At approximately 2:16 p.m., the UCA asked ALVAREZ if "he" (the cocaine supplier, CHARLES SPAULDING) knew that they were coming. ALVAREZ looked at his cellular telephone and responded, "Yeah, this is him right here." Pen register data showed that Target Phone 1 placed an outgoing call to Target Phone 2. ALVAREZ's side of the conversation was audible and recorded. ALVAREZ asked, "Where you at? . . . Spot . . . Alright well, hold on, man, hold on. Meet me by Comales then [Taqueria Los Comales, 6035 South Pulaski, Chicago, Illinois] . . . 'Cause we're like right down the street . . . That cool? . . . Nigga we ain't gonna sit around and wait all day [to complete the cocaine transaction] . . . Where you at right now? . . . You already went all the way back down? . . . Yeah, that was like half an hour ago . . . Yep . . . Don't trip. It's all good, dog . . . Wait for me right there, man."

40.     After the conversation ended, at approximately 2:18 p.m., the UCA told ALVAREZ that "he" (referring to the cocaine supplier, CHARLES SPAULDING) better not leave. ALVAREZ assured UCA that he was not going to leave and that he "got in his other car. He's circling around. He told me 'Where you at? Where you at? Is she straight? Is she straight?'" (referring to the UCA and whether she could be trusted). At approximately 2:19 p.m., ALVAREZ told UCA to turn right on 67th Street/Marquette Road.

41.     The UCA confirmed that the supplier was going to be at the meet spot and ALVAREZ stated that he would. ALVAREZ further explained that CHARLES SPAULDING was "paranoid." ALVAREZ stated, "For him to be paranoid for what we're doing right now, is like, he

should be paranoid about it, like if he was like moving bricks and bricks and bricks [kilograms of cocaine] . . . he like rarely ever does this, and then when he does, he's like, I don't know, think's he like John Gotti, or something."

42.     At approximately 2:20 p.m., the UCA asked ALVAREZ if his source "does more" (can supply more) than four and a half ounces of cocaine. ALVAREZ stated, "Whatever yous want . . . The way the coke [cocaine] goes, it's, an eighth [of a kilogram] is four and a half [four and a half ounces], a quarter is a nine piece [nine ounces]." At the UCA's prompting, ALVAREZ clarified, "O.K. How can I explain it to you . . . There's four quarters in a kilo [kilogram] . . . Every quarter [kilogram] is nine ounces. Every nine ounces is probably gonna cost like about, shit, I don't know man, probably like, I don't know. I have to talk to him to be honest with you." The UCA asked ALVAREZ if he could ask CHARLES SPAULDING so then the UCA could relay the information to her (fictitious) boyfriend. ALVAREZ said that he would. The UCA stated that her boyfriend did deal in larger quantities, but he was just "shopping" right now (looking for the best deal). ALVAREZ stated, "Actually, it's better when you do get uh . . . 'cause when it's more . . . it'll be one solid piece . . . The guy that he fucks around with, you know, he has to break it off of a kilo, and then he gives it to him [CHARLES SPAULDING] and then . . . that's why he [CHARLES SPAULDING] gets all paranoid, 'cause then we gotta go take back this guy [CHARLES SPAULDING's supplier] his fucking money."

43.     At approximately 2:24 p.m, ALVAREZ told the UCA "All right. You're gonna pull into that BP gas station [located near 67th/Marquette in Chicago] . . . Pull like on the left side (south side). Like where there are hardly any cars . . . by that white truck." The UCA asked if she should pull in and look like she was getting gas. ALVAREZ responded, "Yeah, just pull in there like you're

gonna get gas and I was gonna jump out and run in there real quick and I'll come back out." The UCA asked, "He's (CHARLES SPAULDING) inside?" ALVAREZ responded, "Yeah, he's inside the house [belonging to ALVAREZ's brother on Marquette]." UCA asked if he had just said that CHARLES SPAULDING was inside the house. ALVAREZ responded, "Yeah, I have to run in there [the house] and get it [the cocaine] and come back out."

44.     At approximately 2:25 p.m., surveillance personnel observed ALVAREZ exit the rear passenger seat of the UCA's vehicle and walk westbound around a white fence that separated the BP gas station from a north/south alley, that separated the BP gas station from ALVAREZ's brother's residence on Marquette. The surveillance personnel observed ALVAREZ walk to the rear of the residence, enter the residence, and exit the residence shortly thereafter.

45.     At approximately 2:27 p.m., ALVAREZ entered the rear passenger seat of UCA's vehicle. After ALVAREZ entered the car he stated, "He's [CHARLES SPAULDING is] something else...'I better come back.'...That's what he [CHARLES SPAULDING] told me, 'I better come back.'" CW1 stated, "Like you're gonna take off on him." As ALVAREZ was talking, he placed a clear plastic zip-lock bag containing a pinkish powdery substance believed to be cocaine on the front middle console for the UCA. As the UCA inspected the bag of suspect cocaine, the UCA told ALVAREZ, "It looks pink [referring to the color of the cocaine]." ALVAREZ responded, "Yeah." The UCA asked if ALVAREZ's source had weighed it. ALVAREZ stated that he had and told the UCA that if there were any problems to just call CW1 right away and they would straighten them out. The UCA placed the bag of suspect cocaine in the driver's side door pocket underneath a bunch of tissue. The UCA confirmed that the cost of the cocaine was $2400, and handed ALVAREZ the money for ALVAREZ to count. ALVAREZ asked UCA if it was all there (if the money was all

there). After the UCA confirmed that it was, ALVAREZ leaned from the back seat in between the front seat and told the UCA, "I was gonna tell you, that's not a good hiding spot [for the cocaine] right there [in the driver's side door pocket under a bunch of tissues]." The UCA stated that she had hidden stuff there before, because it would be under tissues that she used for her allergies. ALVAREZ then opened the middle console and stated, "No, this car doesn't have it [a storage space] ... Or in your truck or something." The UCA told ALVAREZ that they were good and that she did not want to sit there now that she had it (the cocaine). The UCA asked ALVAREZ if he had asked his supplier about the price of a kilogram of cocaine. ALVAREZ told UCA to call him back in two minutes because he would ask his supplier right then.

46.     At approximately 2:29 p.m., surveillance personnel observed ALVAREZ exit the UCA's vehicle at the BP gas station and return to his brother's residence. The UCA and CW1 left the area in the UCA's vehicle. Pen register data showed that Target Phone 1 received an incoming telephone call from Target Phone 2 at approximately 2:29 p.m. Seconds later, Target Phone 1 placed an outgoing call to Target Phone 2.     Based on my experience, I believe that CHARLES SPAULDING was checking with ALVAREZ to see if the deal had been successfully completed.

47.     At approximately 2:33 p.m., surveillance personnel observed ALVAREZ exit the residence located at 4015 West Marquette, and walk northbound to The Huck Finn Restaurant located at 6650 South Pulaski, Chicago, Illinois.

48.     At approximately 2:45 p.m., pen register data showed that Target Phone 1 placed an outgoing telephone call to Target Phone 2. I believe that ALVAREZ told CHARLES SPAULDING that he was at the Huck Finn Restaurant. Around this same time, a FBI agent walked into the Huck

Finn Restaurant and observed ALVAREZ sitting alone, eating a bowl of soup, and talking on a cellular telephone.

49.     At approximately 2:56 p.m., CW1 made a consensually recorded call to ALVAREZ on Target Phone 1. CW1 asked if ALVAREZ had talked to "him" (CHARLES SPAULDING), and ALVAREZ replied that he had. When CW1 asked what he said, ALVAREZ replied "forty-five" ($4500). ALVAREZ said he would be home in about 20 to 30 minutes.

50.     At approximately 2:59 p.m., CW1 made a consensually recorded call to ALVAREZ on Target Phone 1. CW1 clarified, "It's forty-five hundred [$4500] for the nine piece [9 ounces] . . . O.K. So, it's like nine thousand [$9000] if she [the UCA] wanted a full one [kilogram of cocaine], right?" ALVAREZ replied "no." CW1 then asked how much for a "whole one [kilogram of cocaine]." ALVAREZ told CW1 to "Call me back in two seconds." The conversation ended at approximately 3:00 p.m. At approximately this same time, an FBI agent observed CHARLES SPAULDING enter the Huck Finn Restaurant. Shortly thereafter, a law enforcement officer entered the Huck Finn Restaurant and observed ALVAREZ talking on a cellular telephone while sitting with CHARLES SPAULDING.

51.     At approximately 3:02 p.m., CW1 made a consensually recorded call to ALVAREZ on Target Phone 1. CW1 asked ALVAREZ what "he" (CHARLES SPAULDING) said. ALVAREZ asked, "How old's your daughter?" CW1 replied, "Nineteen." ALVAREZ said, "O.K. minus one" ($18,000 for a kilogram of cocaine). ALVAREZ asked CW1 whether she understood. ALVAREZ and CW1 agreed to talk later.

52.     At approximately 3:08 p.m., video surveillance observed CHARLES SPAULDING standing in front of Huck Finn's Restaurant attempting to place a cellular telephone call. CHARLES

22

SPAULDING was observed wearing an oversized jersey, long oversized jean shorts, white tennis shoes, glasses, and he had braided hair. CHARLES SPAULDING's appearance was consistent with the description that ALVAREZ had provided. At approximately 3:09 p.m., CHARLES SPAULDING placed another cellular telephone call and appeared to have a conversation. Approximately one minute later, CHARLES SPAULDING re-entered HUCK FINN's. At approximately 3:15 p.m., surveillance personnel observed CHARLES SPAULDING enter the Tahoe. Surveillance agents further observed ALVAREZ enter the passenger side of the vehicle and shortly thereafter, the vehicle left the parking lot.

53.     Following their departure from the BP gas station, the UCA drove herself and CW1 to a prearranged meet location, where the UCA provided law enforcement with the bag containing suspect cocaine that ALVAREZ had given to the UCA. The contents of the bag were analyzed and found to contain approximately 110.5 grams of cocaine hyrdochloride.

**D.     July 22, 2005 Distribution of Cocaine to Individual C by CHARLES SPAULDING and CELESTE MELENDEZ.**

54.     On or about July 22, 2005, at approximately 8:32 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#122). CHARLES SPAULDING asked what Individual C wanted to do. Individual C responded that he wanted the "same [quantity of cocaine as in the past], bro." CHARLES SPAULDING suggested that Individual C go to SPAULDING's house and Individual C agreed. CHARLES SPAULDING said to call him when Individual C got over there and he'd tell his "girl" (CELESTE MELENDEZ) to go outside.

55.     At approximately 8:39 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#123). Individual C asked if CHARLES SPAULDING's "lady [MELENDEZ] hooked

23

[him] up with half (sixteenth ounce of cocaine]." CHARLES SPAULDING said that she did. Individual C agreed and said he would "call [CHARLES SPAULDING] when [he was] there."

56.     At approximately 8:53 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#128). CHARLES SPAULDING told MELENDEZ to "grab a half [sixteenth ounce of cocaine] and have it ready" because the "guy in the black truck's [Individual C] gonna come in the back [of CHARLES SPAULDING's residence located at 1439 South 59th Avenue, Cicero, Illinois (hereinafter "CHARLES SPAULDING's residence) to pick up the cocaine] in a couple of minutes." CHARLES SPAULDING said that he would call MELENDEZ when the customer was "back there" (in the back of CHARLES SPAULDING's residence).

57.     At approximately 9:02 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#129). Individual C told CHARLES SPAULDING he was there (based on subsequent calls, I believe Individual C is referring to CHARLES SPAULDING's residence). CHARLES SPAULDING asked if he was "in the back [of CHARLES SPAULDING's residence]." Individual C said yes. At approximately 9:03 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#130). CHARLES SPAULDING told MELENDEZ that the "guy" (Individual C) was in back.

58.     At approximately 9:08 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#133). CHARLES SPAULDING told MELENDEZ to "bring that money [from Individual C], bring the house keys, grab two more halves [two sixteenth ounce quantities of cocaine], and come in the back [of SPAULDING's residence]."

59.     Based on the foregoing calls, I believe that CHARLES SPAULDING and CELESTE MELENDEZ distributed cocaine to Individual C on or about July 22, 2005.

**E.     July 24-25, 2005 Calls Between CHARLES and JASON SPAULDING Regarding MICHAEL DALTON's Cocaine Debt.**

60.     On July 24, 2005, at approximately 10:51 p.m., CHARLES SPAULDING, using Target Phone 2, called JASON SPAULDING (#747). CHARLES SPAULDING asked JASON SPAULDING if he had seen "LITTLE" (MICHAEL DALTON). JASON SPAULDING said that he saw him earlier. CHARLES SPAULDING said that "[DALTON] owes [CHARLES SPAULDING] forty [$40]," and asked JASON SPAULDING to get the money.

61.     On July 25, 2005, at approximately 2:54 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual H (#806). CHARLES SPAULDING asked if Individual H "got that loot [money]?" Individual H replied that he had "twenty [$20], 'cause [he] got some other shit [cocaine] off of 'FOLKS' (MICHAEL DALTON)." Individual H said that he got "one" (an eighth ounce of cocaine) off of CHARLES SPAULDING's brother (JASON) and "got another one [an eighth ounce of cocaine] off of FOLKS [DALTON]" and only made "$20 bucks, so far." CHARLES SPAULDING told Individual H to not spend CHARLES SPAULDING's money.

**F.     July 26, 2005 Distribution of Cocaine to Individual C by CHARLES SPAULDING and CELESTE MELENDEZ.**

62.     On July 26, 2005, at approximately 7:36 p.m., MELENDEZ called CHARLES SPAULDING on Target Phone 2 (#1063). MELENDEZ asked if she was going to see "this guy [CHARLES SPAULDING's cocaine customer] or not." CHARLES SPAULDING told her to stay in the parking lot of Walgreens and wait because the customer was on his way. MELENDEZ said she would wait.

63.     At approximately 8:27 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#1086). CHARLES SPAULDING asked Individual C what he wanted to do. Individual

25

C said "just a half [sixteenth ounce of cocaine], bro." CHARLES SPAULDING told Individual C that he was going to have to meet CHARLES SPAULDING's girl (MELENDEZ, to complete the transaction) "by Pulaski, by the Burger King." Individual C said he would leave in five to ten minutes, and that he would call CHARLES SPAULDING when he was on the way.

64.    At approximately 10:52 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#1092). Individual C asked CHARLES SPAULDING if he was ready because Individual C would be "there [at the meet location] in eight minutes, bro." CHARLES SPAULDING said that he was ready. Individual C asked if CHARLES SPAULDING would be at the meet location by the time Individual C got there. CHARLES SPAULDING said that "she [MELENDEZ] ain't gonna be there [at the meet location] before you." CHARLES SPAULDING further instructed Individual C to not sit at the Burger King, but instead go down Pulaski, stop somewhere else, and call CHARLES SPAULDING back. CHARLES SPAULDING said he would tell "her" (MELENDEZ) to go to Individual C's location.

65.    At approximately 10:53 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#1093). CHARLES SPAULDING asked MELENDEZ if she was ready to come home. MELENDEZ said she was. CHARLES SPAULDING said that MELENDEZ should give the "other half [sixteenth ounce of cocaine] that [MELENDEZ has] . . . to this guy [Individual C] on Pulaski somewhere." CHARLES SPAULDING said that "the guy" (Individual C) is "about to get off the expressway," and that CHARLES SPAULDING told him to not "just sit at Burger King, though." CHARLES SPAULDING told MELENDEZ to hurry and get her stuff. CHARLES SPAULDING further instructed MELENDEZ to call him when she is driving down Pulaski so that he can tell her where to meet Individual C. CHARLES SPAULDING said that after MELENDEZ

26

meets Individual C, he would meet up with her and give her the house keys and the remote to the garage.

66.     At approximately 10:57 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#1096). Individual C asked CHARLES SPAULDING where CHARLES SPAULDING was. CHARLES SPAULDING said that he "ain't over there [at the meet location," but that "[his] girl's [MELENDEZ] going over there." Individual C asked if CHARLES SPAULDING wanted him "to meet her [MELENDEZ] at the Burger King" because he's at the Burger King already. CHARLES SPAULDING told Individual C to "keep going down Pulaski, dog." Individual C asked if "she [MELENDEZ] gonna take awhile." CHARLES SPAULDING told Individual C to "go down to fucking, to uh, the Comales [believed to be Taqueria Los Comales, 6035 South Pulaski, Chicago, Illinois], right there." CHARLES SPAULDING said that the Comales was on "59th . . . no it's on 60th Place." Individual C confirmed that the Comales was on 60th Place and said that he would "be there shortly."

67.     At approximately 11:08 p.m., Individual C called CHARLES SPAULDING on Target Phone 2 (#1104). Individual C asked if "she" (MELENDEZ) was "almost here [at the meet location], bro." CHARLES SPAULDING said "yes bro, yes." At approximately 11:09 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#1105). CHARLES SPAULDING asked where MELENDEZ was. MELENDEZ said she was "trying to get into the car." SPAULDING said that the "dude's [Individual C] at Comales [the meet location] already."

68.     At approximately 11:15 p.m., MELENDEZ called CHARLES SPAULDING on Target Phone 2 (#1115). CHARLES SPAULDING told MELENDEZ to go up to the "fucking cripple guy [Individual C] in the truck." MELENDEZ said she saw the guy but had to run up to his

27

car. CHARLES SPAULDING said that "the guy" (Individual C) is "in the fucking wheelchair." MELENDEZ said she knew that, but CHARLES SPAULDING didn't "tell [her] who the hell to look for." MELENDEZ said she just saw "him" (Individual C). SPAULDING said that MELENDEZ should have looked first.

69.     Based on the foregoing calls, I believe that CHARLES SPAULDING and CELESTE MELENDEZ distributed cocaine to Individual C on or about July 26, 2005.

**G.     August 1, 2005 Distribution of Cocaine to MICHAEL DALTON by CHARLES SPAULDING.**

70.     On August 1, 2005, at approximately 7:26 p.m, DALTON called CHARLES SPAULDING on Target Phone 2 (#2279). DALTON greeted CHARLES SPAULDING and identified himself as "LITTLE FOLKS." CHARLES SPAULDING said "What's up? I got you too . . . I'll be over there in a minute . . . I got you" (meaning SPAULDING would deliver an eighth ounce of cocaine to DALTON)." DALTON replied "Alright."

71.     Based on the foregoing call, I believe that CHARLES SPAULDING distributed cocaine to MICHAEL DALTON on or about August 1, 2005.

**H.     August 2, 2005 Controlled Buy Approximately 251 Grams of Cocaine from ERICK ALVAREZ and CHARLES SPAULDING.**

72.     On or about July 31, 2005, the UCA called ALVAREZ on Target Phone 1. During this call, the UCA discussed her interest in purchasing nine ounces of cocaine. The UCA and ALVAREZ discussed the price of the cocaine. This call was only partially recorded due to technical difficulties with the recording device.

73.     At approximately 9:11 p.m. ALVAREZ, using Target Phone 1 (#813) called CHARLES SPAULDING on Target Phone 2. ALVAREZ asked CHARLES SPAULDING, "How

much for a nine piece [nine ounces of cocaine]?" CHARLES SPAULDING replied, "For you, C.O.D. [cash on delivery], on the rush . . .45 [$4500] . . . That too much?" ALVAREZ replied, "Hell yeah." CHARLES SPAULDING said, "Nah, but it's different [with respect to quality from the cocaine CHARLES SPAULDING had sold ALVAREZ in the past], nigga." CHARLES SPAULDING asked, "Wow, how much you want to spend [on the cocaine], tell me?" ALVAREZ replied, "How much different is it [the quality of the cocaine]?" CHARLES SPAULDING stated, "I promise it is nice, nigga. If you want, come right here cross, come to JOKER's [JASON SPAULDING's], in the garage, I'll show you something." ALVAREZ agreed.

74.    On or about August 1, 2005, at approximately 8:00 p.m., the UCA called ALVAREZ on Target Phone 1 (#934). The UCA asked ALVAREZ if they were "all set for tomorrow [meaning to conduct the transaction for nine ounces of cocaine]." ALVAREZ stated that they were good. The UCA asked ALVAREZ if there was any way that "he would come down a little"(referring to the price ALVAREZ's supplier, CHARLES SPAULDING, was asking for the nine ounces). ALVAREZ replied that he could "talk to him, but not, it's not [ALVAREZ's] stuff." ALVAREZ stated that he would see what he (the cocaine supplier) says. The UCA asked ALVAREZ if he could ask him if he could come down a little bit so she could go back to her guy and say he was pretty cool and that he came down a little bit. ALVAREZ agreed to call his supplier (CHARLES SPAULDING).

75.    At approximately 10:14 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#965) on Target Phone 2. CHARLES SPAULDING asked ALVAREZ how they were looking for tomorrow['s cocaine transaction]. ALVAREZ replied "yeah, supposedly 2:00 [p.m.]." CHARLES SPAULDING replied "thanks nigga."

76.     At approximately 10:47 p.m., the UCA called ALVAREZ on Target Phone 1 (#974). The UCA asked ALVAREZ whether he had tried to call, and ALVAREZ replied that he did. ALVAREZ stated, "I talked to my guy [cocaine supplier, CHARLES SPAULDING], man, and he ain't trying to budge." The UCA asked ALVAREZ, "he swears by this [the quality of the cocaine]?" and ALVAREZ replied, "yep, he's telling me that if he budges [reduces the price of the cocaine] it ain't even worth it to him [financially]." The UCA then asked, "it's that good [referring to the quality of the cocaine]?" ALVAREZ said yes. The UCA further asked, "you had given some [of the high quality cocaine] to somebody and they really like it, right?" ALVAREZ said "they liked it." The UCA then asked whether ALVAREZ had anyone else that liked it. ALVAREZ replied, "no, I only had a little bit [of the high quality cocaine], I didn't have enough to give out to a lot of people." The UCA then asked, "for 5 [$5,000 for nine ounces of cocaine] right?" ALVAREZ replied, "yeah, 2:00 [p.m.]." The UCA said, "2:00 [p.m.], do you want me to drive through and pick you up [at ALVAREZ's residence]?" The UCA told ALVAREZ that she would pick ALVAREZ up at ALVAREZ's residence. ALVAREZ told the UCA to call him because he might be moving about. The UCA then told ALVAREZ that she would touch base with him a little bit before 2:00 [p.m.] to see where he was. The UCA asked if they were going to meet "him" (referring to the cocaine supplier) somewhere, and ALVAREZ agreed. The UCA asked if he knew where they were going to meet, and ALVAREZ replied that he would know tomorrow.

77.     On August 2, 2005, at approximately 1:14 p.m., the UCA called ALVAREZ on Target Phone 1 (#1020). The UCA asked ALVAREZ, "Are we still on [for the cocaine transaction]?" ALVAREZ asked the UCA whether she was on her way. ALVAREZ told the UCA that he would call her back in one minute because he needed to make sure (that the cocaine

transaction was still happening). The UCA told ALVAREZ to find out beforehand if "he" (referring to ALVAREZ's supplier, CHARLES SPAULDING) was coming to ALVAREZ's or if they were going to his (CHARLES SPAULDING's) place.

78.    At approximately 1:15 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#1022) on Target Phone 2. ALVAREZ asked CHARLES SPAULDING, "you straight [ready to conduct the cocaine transaction] or what?" CHARLES SPAULDING said "yeah" and that he was at his "crib" with his girl. ALVAREZ told CHARLES SPAULDING that he would be on his way.

79.    At approximately 1:23 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#1023) on Target Phone 2. ALVAREZ asked CHARLES SPAULDING where they were going to meet. ALVAREZ stated "Comales" (believed to be Taqueria Los Comales, 6035 South Pulaski, Chicago, Illinois). CHARLES SPAULDING suggested that he would pay for ALVAREZ's cab ride to CHARLES SPAULDING's "crib" (home) and ALVAREZ would pay for his cab ride back to ALVAREZ's crib. ALVAREZ asked, "why, to go pick it [the cocaine] up and come back?" CHARLES SPAULDING replied, "yeah." ALVAREZ replied that it would take too long, and told CHARLES SPAULDING to leave "it" (the cocaine) "in the Bonne" (the Bonneville), and when ALVAREZ got close CHARLES SPAULDING could "pop the trunk [of the Bonneville] from inside [CHARLES SPAULDING's home]."

80.    On or about August 2, 2005, at approximately 1:25 p.m., the UCA called ALVAREZ on Target Phone 1 (#1024). The UCA asked ALVAREZ if he called him (referring to ALVAREZ's supplier, CHARLES SPAULDING). ALVAREZ stated, "yeah, he said it's all good." The UCA asked ALVAREZ where they were going to do it (the cocaine transaction). ALVAREZ replied they

would do it at "his [ALVAREZ's cocaine supplier's] place [home] . . . as close to where [they – the UCA and ALVAREZ] went last time [referring to a previous transaction on June 8, 2005 transaction between ALVAREZ and the UCA]."

81.     At approximately 1:28 p.m., CHARLES SPAULDING, using Target Phone 2, called ALVAREZ on Target Phone 1 (#1026). CHARLES SPAULDING told ALVAREZ that he was at his house. ALVAREZ asked CHARLES SPAULDING how he should do it (the cocaine transaction) and whether he should just go over to CHARLES SPAULDING's house. CHARLES SPAULDING asked if ALVAREZ would be "with dude" (referring to ALVAREZ's customer, the UCA). ALVAREZ asked how else he would get to CHARLES SPAULDING's. CHARLES SPAULDING offered to pick ALVAREZ up and bring him (ALVAREZ) to his (CHARLES SPAULDING's) house. ALVAREZ asked if CHARLES SPAULDING could "just throw it [the cocaine] in the back of the Bonneville" and ALVAREZ would call CHARLES SPAULDING as soon as he got close. CHARLES SPAULDING could unlock it (the Bonneville), give it (the cociane) to dude (ALVAREZ's customer, the UCA) and wait until he (the UCA) left and go to his (CHARLES SPAULDING's) house. ALVAREZ told CHARLES SPAULDING that way, he (referring to ALVAREZ's customer) won't see where CHARLES SPAULDING lives. ALVAREZ further told CHARLES SPAULDING that he didn't want to "ride around with that" (referring to the cocaine). After some additional discussion, CHARLES SPAULDING asked ALVAREZ "what are you gonna grab right now, just the nine [ounces of cocaine]?" ALVAREZ responded "yeah." CHARLES SPAULDING told ALVAREZ to park in back of the garage (of CHARLES SPAULDING's residence) and he would open the door for ALVAREZ to "grab it [the cocaine] outta' there [the Bonneville]." CHARLES SPAULDING told ALVAREZ that he would be back there (by the garage)

32

waiting for him. CHARLES SPAULDING further told ALVAREZ that he could "hit him" (call him) and then CHARLES SPAULDING would take ALVAREZ home.

82.     At approximately 2:24 p.m, the UCA called ALVAREZ on Target Phone 1 (#1036), and told ALVAREZ that she was coming (in the UCA's vehicle) up Campbell (near ALVAREZ's residence), but that she did not remember which house was his. ALVAREZ told the UCA that he would be outside. ALVAREZ subsequently got into the UCA's vehicle. At ALVAREZ's direction, the UCA and ALVAREZ subsequently drove together to the area near CHARLES SPAULDING's residence.

83.     At approximately 2:42 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#1040) on Target Phone 2. ALVAREZ asked CHARLES SPAULDING what street it [CHARLES SPAULDING's residence] was on. CHARLES SPAULDING told ALVAREZ "on 59th Avenue" and gave ALVAREZ directions to his alley (on which the garage was located) from Austin and 26th. Upon arriving in the area of 59th Avenue and 15th Street in Cicero, Illinois, the UCA parked the car at which time ALVAREZ exited the UCA's vehicle.

84.     At approximately 2:48 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#1043) on Target Phone 2 and told him "I'm in back [of CHARLES SPAULDING's residence]." CHARLES SPAULDING told ALVAREZ, "tell me if the garage door starts opening so I can hit the button [to open the Bonneville] from here, if you want . . . or you wanna walk through the gangway and come to the . . ." ALVAREZ replied, "it doesn't matter. I'm right here by your gate."

85.     Surveillance personnel observed ALVAREZ walk to CHARLES SPAULDING's garage at 1439 South 59th Avenue, Cicero, Illinois. ALVAREZ knocked on the garage door and

33

then entered. At approximately 2:50 p.m., surveillance observed ALVAREZ exit the garage and walk back to the UCA's vehicle. After ALVAREZ entered the UCA's vehicle, ALVAREZ stated, "he's [CHARLES SPAULDING] not coming . . . he's not dressed." The UCA asked, "does he have a scale in there, or something like that, so we can at least weigh it [the cocaine] to make sure I'm not getting . . . shorted?"

86.     At approximately 2:52 p.m., ALVAREZ, using Target Phone 1, called CHARLES SPAULDING (#1045) on Target Phone 2. ALVAREZ asked CHARLES SPAULDING if he had a "ruler" (referring to a scale to weigh the cocaine). CHARLES SPAULDING asked "for real?" ALVAREZ laughed and said "yeah, for real." CHARLES SPAULDING told ALVAREZ "it's straight dog" (the drug quantity was correct). CHARLES SPAULDING stated that he had a ruler, but this was "crazy in the back of the crib." ALVAREZ stated that he knew. CHARLES SPAULDING asked ALVAREZ whether he was going to "sit there and weigh each one of those" (referring to the individually wrapped bags of cocaine). ALVAREZ said, "I ain't trying to." CHARLES SPAULDING replied "man, tell dude [the customer, the UCA] pull in the fucking garage, dog." ALVAREZ replied "alright." CHARLES SPAULDING stated, "man, it's too hot for all that stupid ass shit, bro" (meaning that there were too many police in the area). ALVAREZ replied "alright."

87.     After the above conversation, ALVAREZ handed the UCA two plastic bags, one white and one brown. The white plastic bag contained six individually packaged clear plastic bags containing suspect cocaine. The brown plastic bag contained five clear plastic bags containing suspect powder cocaine. ALVAREZ retrieved one plastic bag from each of his front pant's pockets.

The UCA subsequently handed ALVAREZ $5000 in exchange for the cocaine. At approximately 2:59 p.m., ALVAREZ exited the UCA's vehicle and returned to CHARLES SPAULDING's garage.

88.     The contents of the individually wrapped clear plastic bags found in the white and brown plastic bags ALVAREZ delivered to the UCA on or about August 2, 2005 were analyzed and found to contain a total of approximately 251 net grams of cocaine hydrochloride.

### I.     August 5, 2005 Distribution of Cocaine to MICHAEL DALTON by CHARLES SPAULDING.

89.     On or about August 5, 2005, at approximately 11:33 p.m., DALTON called CHARLES SPAULDING on Target Phone 2 (#3291). DALTON told CHARLES SPAULDING he had "40 bucks [$40]" for him. CHARLES SPAULDING and DALTON discussed where DALTON would be and how CHARLES SPAULDING could get in contact with him. DALTON asked CHARLES SPAULDING if he had "any more" (referring to cocaine for DALTON to sell). CHARLES SPAULDING said that he "had" DALTON, and he would hit him up right now (meaning that CHARLES SPAULDING had cocaine and would deliver it to DALTON).

90.     At approximately 11:42 p m., CHARLES SPAULDING, using Target Phone 2, called CW1 (#3305). CHARLES SPAULDING told CW1 to tell Individual H and "LITTLE FOLKS" (DALTON) to come out front (so that CHARLES SPAULDING could deliver cocaine to the two of them).

91.     On or about August 6, 2005, at approximately 9:47 p.m., DALTON called CHARLES SPAULDING on Target Phone 2 (#3737). DALTON told CHARLES SPAULDING he "got [SPAULDING's] eighty bucks [$80] already." CHARLES SPAULDING asked if DALTON had all of the money (from DALTON's sale of cocaine). DALTON told him he did. CHARLES SPAULDING asked if DALTON wanted him "to bring [DALTON] another one." DALTON said

he did "but there's a problem" because he was "all the way by 39th and Harlem." CHARLES SPAULDING said he would call DALTON back later because CHARLES SPAULDING was in the middle of something.

92.     Based on the foregoing calls, I believe that CHARLES SPAULDING distributed cocaine to MICHAEL DALTON, on or about August 5, 2005.

### J.     August 19, 2005 Distribution of Cocaine to MICHAEL DALTON by CHARLES and JASON SPAULDING.

93.     On or about August 19, 2005, at approximately 6:37 p.m., DALTON called CHARLES SPAULDING on Target Phone 2 (#7207). DALTON identified himself as "LITTLE," and said that he had "that" (drug proceeds). DALTON further stated that CHARLES SPAULDING should call Individual H's phone whenever CHARLES SPAULDING wanted the drug proceeds. CHARLES SPAULDING asked DALTON how long he was going to be out there. DALTON replied that he was going to be out there all night and that he would "need some more [cocaine to sell]." CHARLES SPAULDING said he "had" DALTON (meaning that CHARLES SPAULDING would supply DALTON with additional cocaine).

94.     At approximately 7:24 p.m., CHARLES SPAULDING, using Target Phone 2 (#7210), called JASON SPAULDING. CHARLES SPAULDING asked JASON SPAULDING when he would be coming back. JASON SPAULDING said that he was already back, in the neighborhood. CHARLES SPAULDING asked JASON SPAULDING if he did anything with those "two halfies" (two sixteenth ounces of cocaine). JASON SPAULDING said he was about to do something with them. CHARLES SPAULDING asked what that was. JASON SPAULDING said he was going to "take them both [the two sixteenth ounces of cocaine] for 70 [$70]." CHARLES SPAULDING told JASON SPAULDING that he was "going to send LITTLE [DALTON] and [he

36

was] going to tell LITTLE to meet [JASON SPAULDING], . . . so [JASON SPAULDING] can give him [DALTON] something." CHARLES SPAULDING explained DALTON was "going to give [JASON SPAULDING] some loot [money]."

95.     At approximately 7:32 p.m., CHARLES SPAULDING, using Target Phone 2, called JASON SPAULDING (#7216). CHARLES SPAULDING told JASON SPAULDING to walk in front of JASON SPAULDING's house to see if "LITTLE" (DALTON) was there. JASON SPAULDING said DALTON was with him. CHARLES SPAULDING asked to talk to DALTON. DALTON then got on the phone. CHARLES SPAULDING asked DALTON how much money DALTON had. DALTON said he had a "bill [$100]." CHARLES SPAULDING said to give that to JASON (SPAULDING) and he would tell JASON (SPAULDING) to "give [DALTON] the quarter [ounce of cocaine]." CHARLES SPAULDING said he would "want 175 [$175] back for the quarter [ounce of cocaine]." DALTON said that last time [he bought one quarter ounce of cocaine] CHARLES SPAULDING only charged $150. SPAULDING replied that was the price for "COD" (cash on delivery). DALTON agreed to the arrangement.

96.     At approximately 7:42 p.m., JASON SPAULDING called CHARLES SPAULDING on Target Phone 2 (#7222). SPAULDING said that "LITTLE" (DALTON) would give JASON SPAULDING a "bill" ($100). JASON SPAULDING said that he already received it (the $100). CHARLES SPAULDING said to "give him [DALTON] a whole one [eighth ounce of cocaine] and two half ones [two sixteenth ounces of cocaine]." CHARLES SPAULDING said that he was going to send Individual H down to give JASON SPAULDING $55 and for JASON SPAULDING to "give him a half [sixteenth ounce of cocaine]". JASON SPAULDING told CHARLES SPAULDING that CHARLES SPAULDING was "running out of wholes [eighth ounce quantities

37

of cocaine] and halves [sixteenth ounce quantities of cocaine]." CHARLES SPAULDING said he knew what was left. JASON SPAULDING said the "two [eight ounce of quantities of cocaine CHARLES SPAULDING gave to JASON SPAULDING] last night, those are gone" and JASON SPAULDING had "the loot [money from the sale of that cocaine] right here." JASON SPAULDING and CHARLES SPAULDING discussed who would get what quantities of cocaine. CHARLES SPAULDING said "[Individual H] gets a half [sixteenth ounce of cocaine]." JASON SPAULDING repeated "[DALTON] gets a whole one [eighth ounce of cocaine] and two halves [two sixteenth ounces of cocaine]. [Individual H] gets a half [one sixteenth ounce of cocaine]." JASON SPAULDING said he was there with "it" (the cocaine) and said that CHARLES SPAULDING had "a whole one [one eighth ounce of cocaine] and five half ones [five sixteenth ounces of cocaine]" left. CHARLES SPAULDING said he would "bring some [additional cocaine] by now." JASON SPAULDING said to give him a call.

97.     Based on the foregoing calls, I believe that CHARLES SPAULDING and JASON SPAULDING distributed cocaine to MICHAEL DALTON on or about August 19, 2005.

**K.     August 20, 2005 Distribution of Approximately 2.8 Grams of Cocaine to Individual D by CHARLES SPAULDING and CELESTE MELENDEZ.**

98.     On or about August 20, 2005, at approximately 7:50 p.m., Individual D called CHARLES SPAULDING on Target Phone 2 (#7485). Individual D asked if CHARLES SPAULDING would "come over by this way [to conduct a cocaine transaction]." Individual D wanted to meet up in an hour. CHARLES SPAULDING told Individual D to go by Archer and California (streets in Chicago), and call CHARLES SPAULDING when he was ready to complete the transaction.

99.     At approximately 9:51 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual D (#7509). Individual D asked CHARLES SPAULDING to meet Individual D closer to his house. CHARLES SPAULDING said he couldn't and wanted Individual D to come to CHARLES SPAULDING's house because CHARLES SPAULDING's brother (JASON SPAULDING) "ain't even around over there [where Individual D was at]." Individual D said that CHARLES SPAULDING's house was way too far, and asked if CHARLES SPAULDING could meet him at Archer (a street in Chicago) CHARLES SPAULDING said that he couldn't leave right now, but that he would call Individual D when he could leave. CHARLES SPAULDING explained that he had to wait for his "lady" (MELENDEZ) to get back because she had the car. Individual D said he would be home and asked that CHARLES SPAULDING "hit him up" (call him). Individual D said he wanted a "whole one [eighth ounce of cocaine]." SPAULDING said he would send "her" (MELENDEZ) to meet Individual D on Archer (a street in Chicago).

100.     At approximately 9:54 p.m., Individual D called CHARLES SPAULDING on Target Phone 2 (#7511). CHARLES SPAULDING asked how long it would take for Individual D to get to the Burger King on Pulaski and I-55. Individual D said he could be there in "15-17 minutes." CHARLES SPAULDING said, "alright, I'll have her [MELENDEZ] go over there [to the Burger King]," and that she would be there in about 20 minutes. Individual D said he was leaving right now, and asked if "she" (MELENDEZ) would be in that Bonneville. Individual D said he would be in a red Escort. CHARLES SPAULDING told Individual D to leave right know so that MELENDEZ would not have to wait. SPAULDING confirmed Individual D wanted a "whole one (eighth ounce of cocaine)."

101.   At approximately 10:33 PM, CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#7518). CHARLES SPAULDING asked if MELENDEZ saw him (Individual D). MELENDEZ said that she did and that "he was on the other side [of the parking lot]." Surveillance personnel observed MELENDEZ and a person later identified as Individual D meet in the parking lot. Surveillance personnel then observed MELENDEZ leave the area in the Bonneville, and Individual D leave the area in a red Ford Escort.

102.   Law enforcement conducted an investigative detention of the red Ford Escort in the vicinity of 48th and Pulaski. The driver of the vehicle identified himself as Individual D. During a pat-down search of Individual D, law enforcement observed a lump protruding from the rear of Individual D's trousers. Individual D provided law enforcement with verbal consent to retrieve the object. Law enforcement subsequently recovered a clear plastic baggie containing a white powdery substance. Individual D admitted that the substance inside of the bag was cocaine. The substance inside of the bag was subsequently analyzed and found to be approximately 2.8 net grams of cocaine.

**L.     September 1, 2005 Call Between ERICK ALVAREZ and DAVID LAMAS[9] Regarding LAMAS's Cocaine Sales to ALVAREZ.**

103.   On or about September 1. 2005, at approximately 10:10 p.m., DAVID LAMAS called ALVAREZ on Target Phone 1 (#4074). During the call, ALVAREZ and LAMAS discussed LAMAS's cocaine sales to ALVAREZ. For example:

---

[9]The identification of DAVID LAMAS in this Affidavit is based upon the following: First, law enforcement has been able to identify LAMAS's voice because that voice has been intercepted numerous times, particularly on Target Phone 1, because LAMAS was identified or identified himself in many of those calls by name; and because the voice was consistently associated with the same phone numbers. Second, during particular intercepted calls, LAMAS arranged to personally meet with other co-conspirators, and those meetings were surveilled by law enforcement. Third, law enforcement has had conversations with DAVID LAMAS during which DAVID LAMAS identified himself.

a.   LAMAS asked ALVAREZ if he was  he was alright and ALVAREZ asked why. LAMAS asked, "that price [for cocaine] is too much for you, or what?" ALVAREZ replied, " a little bit, like 200 [$200] out of my price range." LAMAS told ALVAREZ that he wasn't messing with "gueros [slang for white men]...you know that shit [cocaine] put you on the map." ALVAREZ said he knew but that was all he had to spend. LAMAS told ALVAREZ to give him "the other two [$200] later on...you're paying five [$500] for each one [ounce of cocaine], bro, you're saving like $50 right there."

b.   LAMAS said that he would be willing to drop the price for four and a half ounces of cocaine from "25" ($2500) to "22" ($2200). LAMAS stated "shit, what you paying, like $50 for, you know,  a ball [eighth of an ounce of cocaine, commonly referred to as an eight-ball), . . . you're getting a straight deal right off the bat, bro." ALVAREZ replied, "like I said, I don't got that, I don't got all that, man...I'm saying, I only got two [$2,000] to spend." ALVAREZ and LAMAS talked about "22s" (22 inch rims for wheels on a vehicle) that ALVAREZ was  trying to sell for "two" ($2,000). ALVAREZ said that if he could sell the rims, then he would be "getting double" (twice the amount of cocaine) of what ALVAREZ just asked LAMAS for. ALVAREZ said he was calling a head of time, because he was going to need "some" (cocaine) before the weekend started. LAMAS said he would need a "heads up." ALVAREZ said that was why he was calling LAMAS a couple days ahead because the latest ALVAREZ could get "it" would be Saturday. LAMAS thought that "22" was fair. LAMAS said that he would take a look at the rims and that he would wait on the other "two" ($200) later on, because LAMAS thought the price  was fair. ALVAREZ said that it was fair but he did not have the "other two [$2,000] to spend." ALVAREZ

said that if he had "it" (the money) he would give it up. ALVAREZ said that he knew "the shit [cocaine] is good," otherwise he would not be calling.

      c.    LAMAS said that he was "looking to come up too [looking to sell increased quantities of cocaine] . . . but like I said, I'm not looking to get rich overnight." LAMAS told ALVAREZ, "if you could come consistent, like every week, if you could make it like every week, you're getting at least four and a split [four and a half ounces], I could probably do that." LAMAS said that if it was not "steady" like that, then $2200 was the "lowest number" (lowest price) he could go (for four and a half ounces of cocaine). LAMAS said that he was straight up, because everybody else was "23 [$2300] to 25 [$2500] easy," and for ALVAREZ he told him "22" ($2200), because he thought it would be "a consistent thing." ALVAREZ asked LAMAS how much he would sell him "four" (four ounces) for. LAMAS said "do the math." ALVAREZ told LAMAS that he would be getting "that" (four ounces) then, and that he did not want to be owing anyone. LAMAS stated, "You worked with me [buying cocaine from LAMAS] from the beginning, you know how I am." LAMAS said that was the whole reason that LAMAS wanted to "holler at" (call) ALVAREZ, because that was the same way that LAMAS worked, not wanting to owe anyone anything. LAMAS told ALVAREZ to let him know and just to give LAMAS a heads up so he could have "it" (the cocaine) ready and so he was not running around. LAMAS said that he would look at those rims too, because if he could take them off ALVAREZ's hands, then he would "sling them" (sell them) somewhere else. LAMAS told ALVAREZ he would holler.

### M.    September 2, 2005 Distribution of Cocaine to ERICK ALVAREZ by DAVID LAMAS.

    104.    On or about September 2, 2005, at approximately 2:11 p.m., LAMAS called ALVAREZ on Target Phone 1 (#4187). ALVAREZ asked LAMAS if he was busy in an hour and

LAMAS said he would be available in two hours, at around 4:00 p.m. LAMAS asked ALVAREZ if he wanted "four" of them (four ounces of cocaine) and ALVAREZ said that he wanted "one" (one ounce of cocaine). ALVAREZ told LAMAS that he would get "the other one" (another ounce of cocaine) next week. LAMAS agreed.

105. At approximately 3:58 p.m., ALVAREZ, using Target Phone 1, called LAMAS, (#4205). LAMAS told ALVAREZ to give him another 20 minutes unless ALVAREZ wanted to meet him in Cicero, or near Ridgeland and 26th. ALVAREZ did not want to meet LAMAS there, so ALVAREZ would need to give LAMAS some time, because he had to go there first. LAMAS said that it would be approximately 20 or 30 minutes depending on traffic.

106. At approximately 4:46 p.m., ALVAREZ, using Target Phone 1, called LAMAS, (#4211). LAMAS told ALVAREZ that he was running behind because he got stuck in some traffic. ALVAREZ asked how long LAMAS would be. LAMAS told ALVAREZ that he was headed there right now and said if ALVAREZ wanted to come his way ALVAREZ could see him sooner, but if not, he was on his way. LAMAS said, "I got you [LAMAS had the cocaine for ALAVAREZ], don't go nowhere." ALVAREZ said that he would be headed right there and he was two blocks away from the meeting location and would just sit there and wait for LAMAS.

107. On September 2, 2005, at approximately 5:22 p.m., LAMAS called ALVAREZ on Target Phone 1 (#4216). LAMAS told ALVAREZ that he was a few minutes away and was coming down the street. ALVAREZ said alright.

108. Based on the foregoing calls, I believe that DAVID LAMAS distributed cocaine to ERICK ALVAREZ on or about September 2, 2005.

**N.    September 3, 2005 Seizure of Approximately 72.6 Grams of Cocaine & Firearms from CHARLES SPAULDING, and Involving CELESTE MELENDEZ, JASON SPAULDING, and ERICK ALVAREZ.**

109.    On or about September 2, 2005, at approximately 5:05 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual F (#8182). CHARLES SPAULDING asked Individual F to to get him "those 22's" ( 22 caliber bullets). Individual F asked, "which ones, short or long." CHARLES SPAULDING replied that he needed the longs or the "22 magnums." Individual F stated that "they" (referring to the employees at the store at which Individual F would obtain the ammunition) would ask him short or long. CHARLES SPAULDING asked if he should try the shorts first, or the longs first. Individual F told CHARLES SPAULDING that he would go to his father's house first, and he would take his dad's .22 caliber shells and they (Individual F and CHARLES SPAULDING) would try them out. CHARLES SPAULDING told Individual F to just "get a box" [of ammunition]. CHARLES SPAULDING further told Individual F that "they [the store at which Individual F will buy the ammunition] got that Dillinger [type of firearm] up there," and Individual F could "point to it [the gun] and say 'this is the one I have. What shells does that take?'" Individual F asked CHARLES SPAULDING what to say if they just asked him "short or long." CHARLES SPAULDING told Individual F to ask for "22 Magnum," but if they still ask whether "short or long, tell them long."

110.    At approximately 6:01 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual F (#8200). CHARLES SPAULDING told Individual F that he left his house and would meet Individual F on the "southside somewhere," and asked what Individual F wanted to "grab." Individual F stated that he wanted "two" (referring to two eighth ounces of cocaine). After some further discussion, Individual F told CHARLES SPAULDING to "leave it [the cocaine] with her

44

[CELESTE MELENDEZ]," and that he wanted "one [eighth ounce of cocaine] and two halves [two sixteenth ounce quantities of cocaine]."

111.    At approximately 7:04 p.m., Individual F called CHARLES SPAULDING on Target Phone 2 (#8208). During the call, Individual F stated that he was on his way to CHARLES SPAULDING's residence. CHARLES SPAULDING asked Individual F if he had stopped at Midwest (the gun store). Individual F replied that he had and that he "take care of" (bought ammunition for) CHARLES SPAULDING. Individual F stated that he told them (the people at the gun store) "which one [gun CHARLES SPAULDING] had" because they didn't have the gun there. Individual F further stated that the "cool dude was there so [Individual F] didn't mind asking him, and he gave the box." According to Individual F, the store employee told him, "just take these [ammunition], these should fit." CHARLES SPAULDING subsequently told Individual F to call when he was in the back (of CHARLES SPAULDING's residence).

112.    At approximately 7:16 p.m., Individual F called CHARLES SPAULDING on Target Phone 2 (#8211). Individual F stated that he was by CHARLES SPAULDING's garage. CHARLES SPAULDING stated that he would tell MELENDEZ to let Individual F in right now. At approximately 7:17 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#8212). CHARLES SPAULDING told MELENDEZ to "let [Individual F] in, he's in the back [by the garage of CHARLES SPAULDING's residence]." CHARLES SPAULDING explained that Individual F would give MELENDEZ "some money [for the cocaine] and a box of those things [bullets]." CHARLES SPAULDING further said that MELENDEZ should give Individual F "that one [eighth of an ounce of cocaine] and two halfs [two sixteenth ounce quantities of cocaine]."

45

113.    At approximately 7:22 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual F (#8214). Individual F stated that he "just left [CHARLES SPAULDING's residence]" and gave "her [MELENDEZ] 140 [$140] plus the shells [ammunition]. The shells [ammunition] were seven bucks [$7]." Based on the foregoing calls, I believe that MELENDEZ distributed a total of one-quarter ounce of cocaine to Individual F on CHARLES SPAULDING's behalf.

114.    On or about September 3, 2005, at approximately 1:41 a.m., JASON SPAULDING called CHARLES SPAULDING on Target Phone 2 (#8466). CHARLES SPAULDING asked JASON SPAULDING "now your dead [have no additional cocaine] right." JASON SPAULDING replied that he only had a "little half of a half," (JASON SPAULDING had less than half of one sixteenth ounce quantity of cocaine). CHARLES SPAULDING told JASON SPAULDING that was JASON SPAULDING's business. JASON SPAULDING told CHARLES SPAULDING that if he gets a phone call [regarding additional cocaine], CHARLES SPAULDING should let JASON SPAULDING know. CHARLES SPAULDING told JASON SPAULDING, "look, nigga, either I'm gonna have to come through and grab that kizocalater [scale] tonight or you're really gonna have to make it in the morning." JASON SPAULDING replied that CHARLES SPAULDING would have to grab it (the scale) later tonight because JASON SPAULDING would have to "take [his] starter off tomorrow."

115.    At approximately 8:04 p.m., JASON SPAULDING called CHARLES SPAULDING on Target Phone 2 (#8778). During the call, CHARLES SPAULDING offered to "take a cab over there [to where JASON SPAULDING was located], man, and bring [JASON SPAULDING] a fucking care package [additional drugs] and this little thing [a gun] because [CHARLES SPAULDING] got the right ones [bullets] from [Individual F] yesterday." At approximately 8:06

p.m., CHARLES SPAULDING, using Target Phone 2, called Express Cab (#8813), identified himself as "Bobby," and told the dispatcher that he needed a cab to take him to "42nd and California."

116.     At approximately 9:41 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#8833), and told her that he was "getting pulled over" (by law enforcement). At approximately 9:42 p.m., after monitoring the foregoing calls, an investigative traffic stop was conducted on the taxi cab in which CHARLES SPAULDING was riding as a passenger. Law enforcement identified the occupants of the cab as CHARLES SPAULDING, CHARLES SPAULDING's three year old son, and an unknown male cab driver.

117.     During the investigative stop, CHARLES SPAULDING told one of the officers that he had some "shit" (drugs) in his pocket. The officer asked CHARLES SPAULDING what he had. CHARLES SPAULDING replied that he had "powder" (cocaine) on him. The officer then recovered a brown plastic shopping bag, containing two smaller white plastic baggies, each containing eleven smaller knotted baggies of suspect powder cocaine, a box of Remington High Velocity .22 caliber ammunition, 98 total rounds, from CHARLES SPAULDING's right front pocket. The officer then asked CHARLES SPAULDING if he had any weapons on him. CHARLES SPAULDING acknowledged that he had a gun in his front left pocket. The officer then recovered a Davis Industries two-shot Derringer with two live rounds, and with a defaced serial number, from CHARLES SPAULDING's front left pocket.

118.     The officer then asked CHARLES SPAULDING what he wanted to do. CHARLES SPAULDING responded that he could obtain two firearms for the officers. CHARLES SPAULDING stated that he would leave the guns for the officers underneath the garbage can at his brother, JASON SPAULDING's residence, located at 4048 South Campbell, Chicago, Illinois

47

(hereinafter "JASON SPAULDING's residence"). The officers released CHARLES SPAULDING, and provided him with the cellular telephone number for one of the officers.

119.    At approximately 9:52 p.m., CHARLES SPAULDING, using Target Phone 2, called JASON SPAULDING (#8839).    During the call, CHARLES SPAULDING told JASON SPAULDING that he had been pulled over by law enforcement who had taken "the deal [gun] off [CHARLES SPAULDING], a box of shells [of ammunition], and three and a half Os [ounces of cocaine]." JASON SPAULDING asked CHARLES SPAULDING where he had been pulled over. CHARLES SPAULDING told him "31st and California." CHARLES SPAULDING said that he "told them [the police] that [CHARLES SPAULDING] would go grab them something [guns], and put it in the alley in the can."

120.    At approximately 10:23 p.m., ALVAREZ, using Target Phone 1, called JASON SPAULDING (#4557).   When ALVAREZ asked JASON SPAULDING what happened, JASON SPAULDING asked if there was "anything [a gun] in the hood." ALVAREZ asked who wanted to buy the gun, and JASON SPAULDING replied, "I do." After ALVAREZ agreed to sell the gun, JASON SPAUDLING asked what gun he had for sale. ALVAREZ replied, "that fucking 32 long [.32 caliber firearm]." When JASON SPAULDING asked ALVAREZ about the cost of the gun, ALVAREZ replied "a bill [$100]." JASON SPAULDING told ALVAREZ that he would be in front (of ALVAREZ'S house) in fifteen minutes.

121.    At approximately 10:55 p.m., ALVAREZ, using Target Phone 1, called Individual G. ALVAREZ asked Individual G if he had "the one [gun]" that they could not get "the things [bullets] for." Individual G replied that he did. ALVAREZ instructed Individual G to "bring it to JOKER [JASON SPAULDING]." ALVAREZ further instructed Individual G to make sure that he

48

gave it to JASON SPAULDING. Approximately ten minutes later, ALVAREZ received a telephone call from Individual G (#4575). Individual G told ALVAREZ that he "did that already [meaning delivered the gun to JASON SPAULDING]." Less than a minute later, ALVAREZ, using Target Phone 1, called Individual G back (#4577). ALVAREZ confirmed that Individual G gave the gun to JASON SPAULDING.

122.    At approximately 11:04 p.m., CHARLES SPAULDING, using Target Phone 2, called the telephone number given to him by the law enforcement officer earlier that evening (#8871). CHARLES SPAULDING advised the officer that there was a gun outside the house located at 4014 Brighton Place in Chicago, Illinois, underneath a garbage can. Approximately fifteen minutes later, law enforcement officers recovered a Smith & Wesson .32 caliber Iver Johnson revolver, bearing serial number 87194 from underneath a garbage can in the alley behind the house located at 4014 Brighton in Chicago.

123.    At approximately 11:25 p.m., JASON SPAULDING called ALVAREZ on Target Phone 1 (#4589). JASON SPAULDING asked ALVAREZ if he had "another one [gun]." When ALVAREZ asked another what, JASON SPAULDING replied one of those "things [guns]." ALVAREZ told JASON SPAULDING that he had another one (gun) for $150. JASON SPAULDING asked ALVAREZ what type of gun it was. ALVAREZ told JASON SPAULDING that it was "a 22 [caliber]...with three boxes of shells [ammunition]." JASON SPAULDING told ALVAREZ to keep the shells (ammunition) because he did not need them.

124.    At approximately 11:54 p.m., CHARLES SPAULDING called the officer on the cellular telephone number previously provided to him (#8890). CHARLES SPAULDING advised the officer that there was a second firearm in the same location (underneath a garbage can in the alley

behind 4014 Brighton Place) where the previous gun had been left for the law enforcement officers. Following the phone call, law enforcement officers recovered a second firearm, namely, a .22 caliber magnum revolver, bearing serial number 856526, from underneath a garbage can in the alley behind the house located at 4014 Brighton Place in Chicago.

125.    The suspect cocaine recovered from CHARLES SPAULDING on September 3, 2005 was analyzed and found to contain a total of approximately 72.6 net grams of cocaine hydrochloride.

**O.    September 4, 2005 Distribution of Cocaine to ERICK ALVAREZ by DAVID LAMAS.**

126.    On or about September 4, 2005, at approximately 6:39 p.m., ALVAREZ, using Target Phone 1, called LAMAS, (#4711). ALVAREZ wanted to know if he could see LAMAS and LAMAS asked at what time. ALVAREZ told LAMAS to let him know what time he wanted. LAMAS asked what was he looking for and ALVAREZ said "same thing as the other day, like two days ago" (referring to the transaction on September 2, 2005 in which LAMAS delivered one ounce of cocaine to ALVAREZ). LAMAS asked, "one [ounce of cocaine] only?" ALVAREZ replied, "yeah." LAMAS told ALVAREZ that he would call him back in ten minutes.

127.    At approximately 6:58 p.m., LAMAS called ALVAREZ on Target Phone 1 (#4718). LAMAS asked ALVAREZ where he was. ALVAREZ said at his "crib" (home). LAMAS and ALVAREZ arranged to meet in Cicero. ALVAREZ asked LAMAS when he should leave. LAMAS told ALVAREZ that he would call when he was 20 minutes away.

128.    At approximately 7:38 p.m., LAMAS called ALVAREZ on Target Phone 1 (#4727). LAMAS told ALVAREZ he would be there in 10 minutes. LAMAS proceeded to give ALVAREZ directions to the meet location. At approximately 7:47 p.m., LAMAS called ALVAREZ on Target Phone 1 (#4733). LAMAS told ALVAREZ to go south on Central and go to "Donald's Famous

Fuckin Hotdog" place, and meet LAMAS in the parking lot in the back. At approximately 7:59 p.m., ALVAREZ, using Target Phone 1, called LAMAS (#4743), and asked him if "it" (the meeting location) was "in back of Duck's." LAMAS said that it was.

129.    On or about September 8, 2005, at approximately 7:54 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5470). LAMAS told ALVAREZ that he got hold of "one guy" (supplier of LAMAS) that said he did not have "anything" (any cocaine), and "another guy" (supplier of LAMAS) got "popped off" (arrested). LAMAS said if he heard of "anything with anyone else" (anyone else who could supply LAMAS with cocaine that LAMAS could, in turn, supply to ALVAREZ), he would let ALVAREZ know. LAMAS asked how ALVAREZ was doing "over there" (at the location where ALVAREZ was selling cocaine). ALVAREZ said "a little struggle" (ALVAREZ was experiencing difficulty selling the cocaine). LAMAS asked, "you already finish that [one ounce of cocaine LAMAS distributed to ALVAREZ on September 4, 2005], or are you still hitting that [same one ounce of cocaine]?" ALVAREZ said "I'm still hitting [selling] it [the one ounce of cocaine]." LAMAS said "Damn dude, what you break it down in [smaller quantities], dime bags [$10 bags of cocaine]?" ALVAREZ said, "no, I've been ... everything's been kinda slow the last couple of days." LAMAS said, "alright man, try to give me the heads up, bro [when ALVAREZ was ready to purchase additional cocaine]."

130.    Based on the foregoing, I believe that DAVID LAMAS distributed cocaine to ERICK ALVAREZ on or about September 4, 2005.

**P.      September 5, 2005 Distribution of Cocaine to Individual E by CHARLES SPAULDING and CELESTE MELENDEZ.**

131.    On or about September 4, 2005, at approximately 9:38 p.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#9009). CHARLES SPAULDING said,

"what I just did right now before we left, can you do it again for me . . . 2-8 [28 grams of cocaine, equivalent to approximately one ounce of cocaine]" (I believe CHARLES SPAULDING is referring to measuring out a one ounce quantity of cocaine). MELENDEZ said, "OK." CHARLES SPAULDING asked if MELENDEZ thought she could because "it might may be kind of hard to, you know, smash it [separate it from the other cocaine in order to measure it], or whatever. Two eight [28 grams of cocaine]."

132. At approximately 9:41 p.m., CHARLES SPAULDING, using Target Phone 2, called Individual E (#9010). CHARLES SPAULDING said, "so you want what I'm gonna give you [a certain quantity of cocaine for Individual E] and then you want a whole O [one ounce of cocaine] for your man." Individual E said "what?" SPAULDING asked again, "you want a whole one [ounce of cocaine] for your man for the five and a half [$550] and you want your thing [a certain quantity of cocaine for Individual E]." Individual E said, "Don't talk on this phone man [about cocaine]." CHARLES SPAULDING asked "come on man, yes or no." Individual E said, "I told you the first time [to not talk about cocaine on the phone], folks, man." SPAULDING asked if Individual E was ready so that CHARLES SPAULDING could just "see [Individual E], grab it [the money for the cocaine], and ride the fuck out." Individual E said, "come one man, you started talking on the phone [about cocaine], I told you that four times already."

133. At approximately 9:44 p.m., MELENDEZ sent a text message to CHARLES SPAULDING that read "2.8 ? [whether MELENDEZ should package 2.8 grams of cocaine]." At approximately 9:49 p.m., CHARLES SPAULDING, using Target Phone 2, sent a text message to MELENDEZ that read "No twenty eight" (instructing MELENDEZ to package 28 grams of cocaine). At approximately 9:50 p.m., MELENDEZ sent CHARLES SPAULDING a text message on Target

Phone 2 that read "Ok [I'll package] just one [ounce of cocaine]." At approximately 9:51 p.m., CHARLES SPAULDING, using Target Phone 2, sent a text message to MELENDEZ that read "Yes" (confirming that MELENDEZ should package one ounce of cocaine).

134. At approximately 9:50 p.m., Individual E called CHARLES SPAULDING on Target Phone 2 (#9019). CHARLES SPAULDING said that he was on his way. Individual E said that he would be "by the corner."

135. At approximately 10:12 p.m., CHARLES SPAULDING, using Target Phone 2, sent a text message to Individual E. The text message read, "Go across the street from Daniels by the park [referring to Douglas Park, located near the intersection of California Avenue and 18th Street in Chicago]." At approximately 10:12 p.m., Individual E called SPAULDING on Target Phone 2 (#9028). CHARLES SPAULDING asked if Individual E "got that [text] message [CHARLES SPAULDING sent at approximately 10:12 p.m.]?" Individual E said no. CHARLES SPAULDING said that he was "right here, a block away." CHARLES SPAULDING asked Individual E to "go across the street from Daniel's." Individual E asked "who the fuck is Daniel?" CHARLES SPAULDING said it was the corner store (referring to a store located in the vicinity of Douglas Park).

136. At approximately 10:22 p.m., Individual E called CHARLES SPAULDING on Target Phone 2 (#9032). CHARLES SPAULDING told Individual E that they would "get up with [Individual E] tomorrow on that other thing [the distribution of one ounce of cocaine to Individual E]." CHARLES SPAULDING explained that it was hard to convince people to drive him around (to distribute cocaine to Individual E), but that he would "get at [distribute cocaine to Individual E] tomorrow" and "have [his] shit [cocaine] right."

137. On September 5, 2005, at approximately 1:18 a.m., CHARLES SPAULDING, using Target Phone 2, sent a text message to MELENDEZ that read "Make [measure out and package] fourteen [grams of cocaine, equivalent to one-half ounce of cocaine] for me." At approximately 1:21 a.m., CHARLES SPAULDING, using Target Phone 2, sent a text message to MELENDEZ that read "Otay [attempting to confirm his prior text message]?"

138. At approximately 1:25 a.m., CHARLES SPAULDING, using Target Phone 2, called MELENDEZ (#9121). CHARLES SPAULDING asked MELENDEZ if she got those messages (that CHARLES SPAULDING had just sent to MELENDEZ). MELENDEZ said she just read them. CHARLES SPAULDING said that he was on his way and told MELENDEZ to "do that" (measure out and package 14 grams of cocaine, equivalent to one-half ounce of cocaine). MELENDEZ asked if that was "a half" (an ounce of cocaine). SPAULDING said that it was. At approximately 1:48 a.m., MELENDEZ called CHARLES SPAULDING on Target Phone 2 (#9132). CHARLES SPAULDING told MELENDEZ to come to the back (of CHARLES SPAULDING's residence) and "open the back door [of the residence]."

139. Based on the foregoing calls, I believe that CHARLES SPAULDING and CELESTE MELENDEZ distributed cocaine to Individual E on or about September 5, 2005.

### Q. September 6, 2005 Distribution of Cocaine to MICHAEL DALTON By CHARLES SPAULDING.

140. On or about September 6, 2005, at approximately 7:25 p.m., CHARLES SPAULDING, using Target Phone 2, called DALTON (#9459). DALTON identified himself as "LITTLE," and told CHARLES SPAULDING that "when [he] get back toward the neighborhood [he] got that [money for SPAULDING]." CHARLES SPAULDING said he would "give [DALTON]

two more [eight ounce quantities of cocaine] right now." CHARLES SPAULDING instructed DALTON to give him a call when he was ready to complete the transaction. DALTON agreed.

141. At approximately 8:20 p.m., DALTON called CHARLES SPAULDING on Target Phone 2 (#9463). CHARLES SPAULDING said that he was on "35th and Archer." DALTON said that he was already in the "'hood on 45th and Western." CHARLES SPAULDING said to meet him at the "Walgreens at Archer and Western" because he did not want to go by the neighborhood.

142. Based on the foregoing, I believe that CHARLES SPAULDING distributed cocaine to MICHAEL DALTON on or about September 6, 2005.

### R. September 9, 2005 Distribution of Cocaine to ERICK ALVAREZ by DAVID LAMAS.

143. On or about September 9, 2005, at approximately 1:40 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5549). LAMAS asked ALVAREZ how was he doing "over there" (at the location at which ALVAREZ sells cocaine). ALVAREZ said "alright." LAMAS asked ALVAREZ, "You all ready for today, cuz I'm at the store [LAMAS was at the location where he purchases or stores cocaine], bro, and I want to make sure [whether ALVAREZ needs any cocaine], man, cuz' I ain't coming back." ALVAREZ told LAMAS, "Fuck it, let me get one [one ounce of cocaine]." LAMAS told ALVAREZ that he would meet ALVAREZ around 5:00 or 6:00 p.m.

144. At approximately 4:19 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5566). LAMAS instructed ALVAREZ to meet him in one hour or one hour and twenty minutes "by the Taco place on Archer, where they have the little Tacos." LAMAS said he would call when he was about 10 to 15 minutes away and asked ALVAREZ if that was cool. ALVAREZ asked if they could do it earlier, because he needed to be somewhere by 6 p.m. LAMAS then told ALVAREZ "no problem." LAMAS said the other way to meet was if ALVAREZ came to Cicero, because that was

the only thing that was slowing LAMAS down. ALVAREZ said no problem and LAMAS said he would try to hurry.

145.    At approximately 5:28 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5580). LAMAS told ALVAREZ that he would be there in a few minutes. At approximately 5:37 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5583). LAMAS asked ALVAREZ where he was. ALVAREZ said he would be there in two minutes. At approximately 5:42 p.m., LAMAS called ALVAREZ on Target Phone 1 (#5585). LAMAS asked where ALVAREZ was and ALVAREZ said he was not even two blocks away.

146.    Based on the foregoing calls, I believe that DAVID LAMAS distributed cocaine to ERICK ALVAREZ on or about September 9, 2005.

### S.    September 11, 2005 Distribution of Cocaine to CHARLES SPAULDING by MICHAEL DALTON.

147.    On or about September 11, 2005, at approximately 12:24 a.m., CHARLES SPAULDING, using Target Phone 2, called DALTON. CHARLES SPAULDING talked to Individual H about having cocaine on him. Individual H called for "LITTLE" (DALTON) in the background and asked DALTON if he had any "work" (cocaine) on him. DALTON got on the phone with CHARLES SPAULDING and identified himself as "LITTLE." CHARLES SPAULDING asked DALTON if he had any "work" (cocaine) on him. DALTON said that he did. CHARLES SPAULDING asked if he had a "40" ($40 worth of cocaine). DALTON said that he had "two dubs [two $20 bags of cocaine]." CHARLES SPAULDING asked if DALTON could borrow two "dubs" (two $20 bags of cocaine) to "serve" (sell to someone else) and would give it (the cocaine) back to DALTON tomorrow. DALTON agreed, and said he was at the dead end of the street. CHARLES SPAULDING said he was on his way.

148.    At approximately 12:34 a.m., DALTON called CHARLES SPAULDING on Target Phone 2 (#10798). DALTON told CHARLES SPAULDING to come through the alley.

149.    Based on the foregoing calls, I believe that MICHAEL DALTON distributed cocaine to CHARLES SPAULDING on or about September 11, 2005.

**T.    September 14, 2005 Controlled Buy of 117.2 Grams of Cocaine from ERICK ALVAREZ and DAVID LAMAS.**

150.    On or about September 12, 2005, at approximately 10:57 p.m., the UCA called ALVAREZ on Target Phone 1 (#6059). The UCA asked ALVAREZ if they could "get together." ALVAREZ asked "When?" The UCA suggested Wednesday (September 14, 2005) at 10:00 a.m. or 11:00 a.m. ALVAREZ asked, "What did you want to get?" The UCA asked, "Can you check for four and a half [four and a half ounces of cocaine]?" ALVAREZ said, "Yeah, I'll check." The UCA asked "Can he [the supplier] do more than four and a half [four and a half ounces of cocaine]?" ALVAREZ said, "Oh, yeah, yeah, he could do whatever." The UCA said "even it we wanted to go up to a K [kilogram of cocaine] or anything?" ALVAREZ said, "Yep." ALVAREZ and the UCA agreed to speak the next day.

151.    On or about September 13, 2005, at approximately 1:38 p.m., ALVAREZ, using Target Phone 1, called LAMAS, (#6084). ALVAREZ said, "I got somebody [the UCA] coming out for one of those [four and a half ounces of cocaine] . . . 'member what I was telling you I wanted to get?" LAMAS asked, "four and a split [four and a half ounces of cocaine]?" ALVAREZ said yes. ALVAREZ told LAMAS that the buyer (the UCA) was coming out tomorrow (Wednesday, September 14, 2005), in the morning at 10:00 a.m. LAMAS asked, " is it sure deal?" ALVAREZ replied, "for sure, for sure." ALVAREZ asked, "How much, and how do you want to do it?" LAMAS replied, "22 [$2200] man. I don't know, however you want to do it?" ALVAREZ asked

how LAMAS wanted to do the deal. LAMAS asked if tomorrow was Wednesday. ALVAREZ said yeah. LAMAS then asked, "What time in the morning, 10:00 a.m.?" ALVAREZ said, "yeah, they come early." LAMAS said, "I might end up seeing you (ALVAREZ) tonight [to drop off the cocaine], and then just stopping by tomorrow and picking it [the money] up." ALVAREZ replied, "Alright, that'll work." LAMAS asked, "What about you, are you straight, or what [asking if ALVAREZ needed drugs for his own supply]?" ALVAREZ replied that he was "straight right now." LAMAS asked, "so just that [four and a half ounces of cocaine], right?" ALVAREZ said yeah. LAMAS said that he would call when he was heading that way.

152.    At approximately 2:04 p.m., the UCA called ALVAREZ on Target Phone 1 (#6085). The UCA said that she had to plan her day and wanted to know if he (ALVAREZ) had talked to him (LAMAS) yet. ALVAREZ said that he had talked to him and that he (LAMAS) would call ALVAREZ back later, but he (LAMAS) said most likely, for sure tomorrow. The UCA said "Most likely or..." ALVAREZ said he (LAMAS) could take care of it. The UCA said "Oh, ok, so he's going to give it to you today, and . . .?" ALVAREZ said, "yeah." The UCA said "And then we can do it whenever, I mean you'll be up, in the morning?" ALVAREZ said "yeah, I'll be up." The UCA said, "Ok so, if we said 10:00, I know that's early, but I'm busy the rest of the day. I can't do it the rest of the day." ALVAREZ said, "yeah, I'll get up." The UCA said "Ok, 10:00. I'll come to you and then you gonna already have it [the four and a half ounces of cocaine]." ALVAREZ said "Yeah." The UCA asked, "Do I need to call back and confirm this with you after you talk to him or you'll give me a call later if something changes?" ALVAREZ said "I'll call you as soon as he calls me." The UCA said "Yeah, let me know when you got it [the four and a half ounces] . . . Can you do that? So then I know that you got it [the four and a half ounces], he's brought it to you and . . .

oh, and I need to know how much [for the four and a half ounces]?" ALVAREZ said "Oh, 25 [$2500]." The UCA said "25 [$2500]? You can't get me any deal, c'mon, I'm a good customer." ALVAREZ responded, "Yeah, I know, but I barely started messing around with this guy." The UCA said "Oh, you just started?" ALVAREZ said, "Yeah." The UCA said "Um, ok, so 25 [$2500], but the next time you'll cut me a deal?" ALVAREZ said, "Yeah." The UCA said "Ok, um alright, tomorrow 10:00 a.m., but you'll call me as soon as you have it tonight to let me know that it's for sure." ALVAREZ said, "Yep." The UCA said OK.

153. At approximately 7:07 p.m., ALVAREZ received an incoming call from LAMAS on Target Phone 1 (#6110). LAMAS left a voice message stating, "D, give me a call, man, in the next five minutes, bro. If I don't hear from you, ah, the window's closed [cocaine would not be available], dog, but ah, give me a call, man, let me know if you still need that [four and a half ounces of cocaine] or not."

154. At approximately 7:21 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6120). LAMAS stated, "What the fuck, man. I was gonna give up on you, man." ALVAREZ asked if LAMAS had been trying to call. LAMAS replied that he had called ALVAREZ four times and this was the last time. ALVAREZ said that his phone was fucked up and he was buying a new one. LAMAS asked ALVAREZ if he was "ready" (for LAMAS to distribute the four and a half ounces of cocaine). ALVAREZ said he needed to get out of the Sprint cellphone store, because he was purchasing a new phone. LAMAS said, "I'll be down there in about half an hour, bro. Is that enough time?" ALVAREZ asked if they were going to go where they met first, and LAMAS said wherever ALVAREZ wanted to go. LAMAS stated, "I'm riding right now, bro, and I need to dump [give ALVAREZ the cocaine], 'cause I can't be riding around [due to the risk of being pulled over and

59

having the police find the cocaine]. I was gonna go back and leave it alone, bro, 'cause . . ." LAMAS asked, "Where? . . . To the taco place?" ALVAREZ told LAMAS, "Nah, nah, nah, the first place." LAMAS asked, "Where? The hotdog place, or the one over there in the South?" ALVAREZ replied, "in the South." LAMAS stated he would be there in an half an hour.

155.    At approximately 7:53 p.m., LAMAS left ALVAREZ a recorded message on Target Phone 1 (#6129), from telephone number (773) 727-3622. LAMAS left a message stating that he would be there in five minutes. At approximately 7:59 p.m., ALVAREZ received an incoming call from LAMAS on Target Phone 1 (#6131). LAMAS asked where ALVAREZ was and ALVAREZ said that he was at the light, about to go right there. LAMAS said that he was already back there.

156.    On or about September 14, 2005, at approximately 7:59 a.m., ALVAREZ, called the UCA and left a voice mail message. The voice mail message left for the UCA was subsequently recorded onto a cassette tape. In his message, ALVAREZ stated that it was 8:00 a.m. and that he was calling to tell the UCA that he was ready. ALVAREZ told the UCA to give him a call and let him know what was going on.

157.    At approximately 8:11 a.m., the UCA called the UCA on Target Phone 1 (#6238). The UCA told ALVAREZ said she received his message. ALVAREZ said that he was ready (he had the four and a half ounces of cocaine). ALVAREZ said 10:00 a.m. was still good and for the UCA to come to his place. The UCA asked ALVAREZ if "it" (the four and a half ounces of cocaine) was there. ALVAREZ said they have to take "a ride real quick [to get the four and a half ounces of cocaine], but that he had it [the cocaine]." ALVAREZ said they would go to the gas station where the UCA left ALVAREZ last time (referring to a BP gas station at the intersection of Pulaski Avenue and 67th Street, where the UCA previously purchased four and a half ounces of powder cocaine from

ALVAREZ and CHARLES SPAULDING on June 8, 2005). The UCA said she would call when she was close.

158. At approximately 10:00 a.m., the UCA called ALVAREZ on Target Phone 1 (#6245). The UCA indicated to ALVAREZ that she was 15 minutes away. At approximately 10:33 a.m., the UCA placed a recorded telephone call to ALVAREZ on Target Phone 1. The UCA told ALVAREZ that she was pulling up outside of ALVAREZ's residence now and asked if that was ALVAREZ outside. ALVAREZ said it was. ALVAREZ entered the UCA's vehicle, and the UCA drove away from the area towards the BP gas station at the intersection of Pualski and 67th Street. During the drive to the gas station, ALVAREZ and the UCA, who was outfitted with a body recording device and transmitter, discussed drug sales and ways of concealing the drugs from law enforcement. The UCA and ALVAREZ arrived at the BP gas station at approximately 10:46 a.m.

159. At approximately 10:44 a.m., surveillance personnel observed ALVAREZ exit the UCA's vehicle and walk westbound toward a detached garage located behind a residence at 4015 W. Marquette in Chicago. While outside of the UCA's vehicle, ALVAREZ, using Target Phone 1, called JASON SPAULDING (#6252). ALVAREZ asked JASON SPAULDING where he was. JASON SPAULDING replied that he was at Archer and Pulaski. ALVAREZ replied, "Alright, well, get here and just pull into my, the driveway right here, 'cause you got the fucking key to the car, that's why I didn't want to give you the keys, I forgot." JASON SPAULDING asked where ALVAREZ was. ALVAREZ said he was waiting for JASON SPAULDING. JASON SPAULDING said he would be there in 10 minutes.

160. At approximately 10:49 a.m., surveillance personnel observed ALVAREZ reenter the UCA's vehicle. ALVAREZ told the UCA "These guys [JASON SPAULDING] are coming to pick

me up. I forgot that I gave him [JASON SPAULDING] the keys to my car. I can't even get in [to the garage . . .but he's already here, he's on, right here on Archer and Pulaski, he'll be here in like five minutes. That's what I get for smoking weed before I do this." ALVAREZ further explained to the UCA that the house at 4015 W. Marquette belongs to ALVAREZ's mother,[10] and that ALVAREZ's mother gives ALVAREZ access to the garage. The UCA asked ALVAREZ "You keep it [the cocaine] at your mom's house?" ALVAREZ responded "In the garage, in my car" (ALVAREZ stores the cocaine in the car in the garage of his mother's home).

161.    While waiting for SPAULDING to bring ALVAREZ the keys, the UCA asked if ALVAREZ's "friend" (the supplier, DAVID LAMAS) gave "it" (the four and a half ounces of cocaine) to him yesterday. ALVAREZ said he did, explaining "Yeah, he's an old friend of mine . . . he be trying to give me some, like, like for myself to sell, like . . . like I was telling him, like man, I'd rather just pay for it, that way if I get in trouble for it . . . I don't end up owing him . . . like right now, I ain't making nothing . . . I'm just doing him the favor . . . He hooks me up, I'm telling you . . . like . . . sometimes, like I won't have all the money, all I'll have is like $400 and he'll just be like 'fuck it, go ahead' . . . he'll let me get like an ounce. Well, he used to do it, I don't know if he's still gonna do it now, but, like the other guy [CHARLES SPAULDING], he was on some bullshit. That's why I stopped fucking with him [buying cocaine from him]." The UCA asked, "and that [the former supplier] was WEDO [CHARLES SPAULDING]?" ALVAREZ said it was.

162.    At approximately 10:57 a.m., surveillance observed the Concorde drive westbound on Marquette. Surveillance personnel observed ALVAREZ exit the UCA's vehicle and walk westbound toward the detached garage located behind the home at 4015 W. Marquette.

_____

[10]On June 8, 2005, ALVAREZ told the UCA that the residence belonged to his brother, Individual A.

163.    At approximately 10:59 a.m., ALVAREZ reentered the UCA's vehicle. ALVAREZ told the UCA that the guys were laughing at him and said, "How the fuck could you go fucking do a deal [to sell cocaine] and forget your keys." ALVAREZ then placed a plastic bag containing suspected cocaine into the UCA's bag inside of the UCA's vehicle. The UCA confirmed that the price of the cocaine was $2500, and handed ALVAREZ $2500. Surveillance personnel observed ALVAREZ exit the UCA's vehicle and walk westbound toward a detached garage located behind the home at 4015 W. Marquette.

164.    The contents of the plastic bag ALVAREZ gave to the UCA were analyzed and found to be approximately 117.2 grams of cocaine hydrochloride.

165.    At approximately 11:00 a.m., ALVAREZ, using Target Phone 1, called LAMAS. ALVAREZ asked where LAMAS was. LAMAS replied he was on 1st Avenue and Cermak, and explained that he needed to go to Loyola to the doctor, but should be done in half an hour. LAMAS then asked "You all good already?" (whether ALVAREZ had LAMAS's money from the sale of the four and a half ounces of cocaine). ALVAREZ replied that he was. LAMAS said he thought ALVAREZ said that he would be ready with LAMAS's money at noon. ALVAREZ replied, "Well, I was just saying, so I could give you this [money] already." LAMAS said that when he got out of the hospital he would call ALVAREZ.

166.    At approximately 1:34 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6260). LAMAS told ALVAREZ that he had left the doctor's office, and asked ALVAREZ about where they should meet. ALVAREZ told LAMAS, "by the little tacos." At approximately 1:59 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6263). LAMAS told ALVAREZ that he was there (at the meet location). ALVAREZ said that he would be right there.

167. At approximately 2:08 p.m., surveillance personnel observed ALVAREZ enter the Concorde, which was parked outside of ALVAREZ's residence, and drive away from the area. Surveillance personnel followed ALVAREZ as he drove to Blake Street, in the vicinity of Archer and Western Avenues, where ALVAREZ arrived at approximately 2:11 p.m. At approximately 2:12 p.m., surveillance personnel observed a 2003 silver GX470 Lexus Sports Utility Vehicle (hereinafter "the Lexus") stop in the alley along Blake Street. The Lexus had an Illinois license plate of T634760. Surveillance personnel observed the driver of the Lexus, later identified as LAMAS, exit the vehicle and meet with ALVAREZ. At approximately 2:13 p.m., surveillance personnel saw ALVAREZ leave the area in the Concorde, and LAMAS leave the area in the Lexus.

168. At approximately 2:25 p.m., law enforcement officers conducted an investigative vehicle stop of the Lexus. The driver of the vehicle identified himself as DAVID LAMAS, JR., of 17049 92nd Avenue in Orland Hills, Illinois. A small child was also in the vehicle, but was not identified. Law enforcement searched LAMAS and found $2300 on LAMAS, in his pocket. Several of the serial numbers on the currency matched the serial numbers of the buy money the UCA paid to ALVAREZ for the four and a half ounces of the cocaine earlier that day. Law enforcement officers seized the money.

169. At approximately 5:35 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6294). LAMAS told ALVAREZ that he was "fucked," because they (the police) got him "big time." LAMAS told ALVAREZ that ALVAREZ was the "last motherfucker [cocaine customer] that [he] had to see." ALVAREZ asked "How much money did you have?" LAMAS replied "Close to 10 [$10,000], bro." LAMAS asked ALVAREZ if he had seen anyone or if anyone followed him (ALVAREZ). LAMAS said that he was there for a minute and he (LAMAS) did not see anybody.

64

ALVAREZ said, "Nah, 'cause before that, the car was just sitting right there and this guy was watching it." LAMAS said, "Where the fuck they came from, bro? . . . I turned, and they [the police] says I ran the red light and I almost hit 'em [referring to the law enforcement officers who conducted the traffic stop]. I did run the red light, but they [the police] were not there . . . they [the police] were being all shyster, bro, and they were behind another car, hiding their plates, and then they pulled onto the shoulder," and told LAMAS to pull off the expressway. LAMAS said he was almost going to put the money in the glove compartment, but left it in his pocket. The police pulled a "big ass wad [of money out of LAMAS's pocket]," and LAMAS asked the police why they just pulled his money. The police then told LAMAS to put his "I.D. and papers and shit back in his pocket" and LAMAS asked the police why they were "just holding [his] money." The police told LAMAS not to worry about it and asked LAMAS where he was from. LAMAS then told ALVAREZ that the police hid his key under the mat of the Lexus and took off. ALVAREZ said that it was "fucked up." LAMAS told ALVAREZ, "I don't know, man . . . I'm calling everybody, bro, so you know anybody who needs anything [customers who need to purchase cocaine], bro . . . let me know." LAMAS told ALVAREZ that he was fucked and that he was "worried, bro . . . I have to go see my people [drug supplier] right now, man, and they gonna look . . . they gonna be like 'yeah right,' [unwilling to believe LAMAS] you know what I'm saying . . . like you telling me, 'yeah, I got pulled over, they [the police] took your shit [money from the sale of cocaine LAMAS supplied]." LAMAS said that he was fucked big time and told ALVAREZ to let him know if he hears anything, to let him know because he could use any help. ALVAREZ said alright.

U. **September 16, 2005 Distribution of Cocaine to ERICK ALVAREZ by DAVID LAMAS.**

170.    On or about September 16, 2005, at approximately 2:00 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6477). LAMAS told ALVAREZ he was "going to the shop" (where LAMAS stores or purchases cocaine) and asked ALVAREZ if he wanted anything (any cocaine) or if he was alright. ALVAREZ said "yeah, I'll take one [one ounce of cocaine]." LAMAS said he would not be able to see ALVAREZ until 8 p.m.

171.    At approximately 6:12 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6492). LAMAS asked if ALVAREZ was ready (to conduct the cocaine transaction). ALVAREZ said that he thought LAMAS said at 8 p.m. LAMAS said he (LAMAS's supplier) "came a little earlier." ALVAREZ said he had to run to Sprint to buy a new phone, and would call LAMAS when he was finished. LAMAS told ALVAREZ to just meet him now and pick it (the cocaine) up. LAMAS told ALVAREZ to meet him at the Walmart located near the intersection of LaGrange and I-55. LAMAS said he would be there in 15 minutes and told ALVAREZ to make sure that no one was following ALVAREZ. LAMAS further stated that he would go see ALVAREZ later that night (to pick up the money).

172.    At approximately 6:40 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6496). ALVAREZ said he was at Cicero Avenue and 80th Street. LAMAS told ALVAREZ to call him when he left. At approximately 7:02 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6505). LAMAS said that he was headed to meet ALVAREZ and would be there in about 10 minutes. ALVAREZ asked where he wanted to meet. LAMAS said, "right there by your spot." ALVAREZ confirmed that it would be "on the south."

66

173.   At approximately 7:18 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6521). LAMAS asked ALVAREZ if he was there (at the meet location).   ALVAREZ said he was down the block.   LAMAS said he would be there in a minute.   At approximately 7:32 p.m., LAMAS called ALVAREZ on Target Phone 1 (#6526).  LAMAS asked ALVAREZ, "You all good ?" (I believe that between 7:18 p..m. and 7:32 p.m., LAMAS delivered the ounce of cocaine to ALVAREZ, so that LAMAS was asking ALVAREZ if he had been stopped by law enforcement following the cocaine transaction).   ALVAREZ replied yes.   LAMAS said that he would either get in touch with ALVAREZ later tonight or tomorrow.

174.   Based on the foregoing calls, I believe that DAVID LAMAS distributed cocaine to ERICK ALVAREZ on or about September 16, 2005.

## V.    CONCLUSION

175.    Based on the foregoing, there is probable cause to believe that ERICK ALVAREZ,

CHARLES SPAULDING, DAVID LAMAS, JASON SPAULDING, MICHAEL DALTON, and

CELESTE MELENDEZ conspired with each other and others known and unknown to the United

States to knowingly and intentionally possess with intent to distribute and to distribute controlled

substances, namely in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic

Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation

of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.


MICHAEL MORELAND
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
this 7th day of November, 2006


HONORABLE MICHAEL T. MASON
United States Magistrate Judge


68